# HIIBEL *v.* SIXTH JUDICIAL DISTRICT COURT OF NEVADA, HUMBOLDT COUNTY, ET AL.

No. 03–5554.  Argued March 22, 2004—Decided June 21, 2004

178

*Robert E. Dolan* argued the cause for petitioner. With him on the briefs were *James P. Logan, Jr.,* and *Harriet E. Cummings.*

*Conrad Hafen,* Senior Deputy Attorney General of Nevada, argued the cause for respondents. With him on the brief were *Brian Sandoval,* Attorney General, and *David Allison.*

*Sri Srinivasan* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Assistant Attorney General*

Wray, Deputy Solicitor General Dreeben, and Joel M. Gershowitz.*

JUSTICE KENNEDY delivered the opinion of the Court.

The petitioner was arrested and convicted for refusing to identify himself during a stop allowed by *Terry v. Ohio*, 392 U. S. 1 (1968). He challenges his conviction under the Fourth and Fifth Amendments to the United States Constitution, applicable to the States through the Fourteenth Amendment.

I

The sheriff's department in Humboldt County, Nevada, received an afternoon telephone call reporting an assault. The caller reported seeing a man assault a woman in a red and silver GMC truck on Grass Valley Road. Deputy Sheriff Lee Dove was dispatched to investigate. When the officer arrived at the scene, he found the truck parked on the side of the road. A man was standing by the truck, and a young woman was sitting inside it. The officer observed skid marks in the gravel behind the vehicle, leading him to believe it had come to a sudden stop.

The officer approached the man and explained that he was investigating a report of a fight. The man appeared to be

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Steven R. Shapiro, Lawrence S. Lustberg,* and *Mark A. Berman;* for the Cato Institute by *Timothy Lynch* and *M. Christine Klein;* for the National Law Center on Homelessness & Poverty et al. by *Carter G. Phillips, Edward R. McNicholas,* and *Rebecca K. Troth;* and for John Gilmore by *James P. Harrison.*

Briefs of *amici curiae* urging affirmance were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the National Association of Police Organizations by *Joel D. Bertocchi* and *Philip Allen Lacovara.*

Briefs of *amici curiae* were filed for the Electronic Frontier Foundation by *Robert Weisberg;* for the Electronic Privacy Information Center et al. by *Marc Rotenberg* and *David L. Sobel;* and for PrivacyActivism et al. by *William M. Simpich.*

intoxicated. The officer asked him if he had "any identification on [him]," which we understand as a request to produce a driver's license or some other form of written identification. The man refused and asked why the officer wanted to see identification. The officer responded that he was conducting an investigation and needed to see some identification. The unidentified man became agitated and insisted he had done nothing wrong. The officer explained that he wanted to find out who the man was and what he was doing there. After continued refusals to comply with the officer's request for identification, the man began to taunt the officer by placing his hands behind his back and telling the officer to arrest him and take him to jail. This routine kept up for several minutes: The officer asked for identification 11 times and was refused each time. After warning the man that he would be arrested if he continued to refuse to comply, the officer placed him under arrest.

We now know that the man arrested on Grass Valley Road is Larry Dudley Hiibel. Hiibel was charged with "willfully resist[ing], delay[ing] or obstruct[ing] a public officer in discharging or attempting to discharge any legal duty of his office" in violation of Nev. Rev. Stat. (NRS) § 199.280 (2003). The government reasoned that Hiibel had obstructed the officer in carrying out his duties under § 171.123, a Nevada statute that defines the legal rights and duties of a police officer in the context of an investigative stop. Section 171.123 provides in relevant part:

> "1. Any peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime.
>
> .     .     .     .     .
>
> "3. The officer may detain the person pursuant to this section only to ascertain his identity and the suspicious circumstances surrounding his presence abroad. Any person so detained shall identify himself, but may not

be compelled to answer any other inquiry of any peace officer."

Hiibel was tried in the Justice Court of Union Township. The court agreed that Hiibel's refusal to identify himself as required by §171.123 "obstructed and delayed Dove as a public officer in attempting to discharge his duty" in violation of §199.280. App. 5. Hiibel was convicted and fined $250. The Sixth Judicial District Court affirmed, rejecting Hiibel's argument that the application of §171.123 to his case violated the Fourth and Fifth Amendments. On review the Supreme Court of Nevada rejected the Fourth Amendment challenge in a divided opinion. 118 Nev. 868, 59 P. 3d 1201 (2002). Hiibel petitioned for rehearing, seeking explicit resolution of his Fifth Amendment challenge. The petition was denied without opinion. We granted certiorari. 540 U. S. 965 (2003).

## II

NRS §171.123(3) is an enactment sometimes referred to as a "stop and identify" statute. See Ala. Code §15–5–30 (West 2003); Ark. Code Ann. §5–71–213(a)(1) (2004); Colo. Rev. Stat. §16–3–103(1) (2003); Del. Code Ann., Tit. 11, §§1902(a), 1321(6) (2003); Fla. Stat. §856.021(2) (2003); Ga. Code Ann. §16–11–36(b) (2003); Ill. Comp. Stat., ch. 725, §5/107–14 (2004); Kan. Stat. Ann. §22–2402(1) (2003); La. Code Crim. Proc. Ann., Art. 215.1(A) (West 2004); Mo. Rev. Stat. §84.710(2) (2003); Mont. Code Ann. §46–5–401(2)(a) (2003); Neb. Rev. Stat. §29–829 (2003); N. H. Rev. Stat. Ann. §§594:2, 644:6 (Lexis 2003); N. M. Stat. Ann. §30–22–3 (2004); N. Y. Crim. Proc. Law §140.50(1) (West 2004); N. D. Cent. Code §29–29–21 (2003); R. I. Gen. Laws §12–7–1 (2003); Utah Code Ann. §77–7–15 (2003); Vt. Stat. Ann., Tit. 24, §1983 (Supp. 2003); Wis. Stat. §968.24 (2003). See also Note, Stop and Identify Statutes: A New Form of an Inadequate Solution to an Old Problem, 12 Rutgers L. J. 585 (1981); Note, Stop-and-Identify Statutes After *Kolender v. Lawson:* Ex-

ploring the Fourth and Fifth Amendment Issues, 69 Iowa L. Rev. 1057 (1984).

Stop and identify statutes often combine elements of traditional vagrancy laws with provisions intended to regulate police behavior in the course of investigatory stops. The statutes vary from State to State, but all permit an officer to ask or require a suspect to disclose his identity. A few States model their statutes on the Uniform Arrest Act, a model code that permits an officer to stop a person reasonably suspected of committing a crime and "demand of him his name, address, business abroad and whither he is going." Warner, The Uniform Arrest Act, 28 Va. L. Rev. 315, 344 (1942). Other statutes are based on the text proposed by the American Law Institute as part of the Institute's Model Penal Code. See ALI, Model Penal Code § 250.6, Comment 4, pp. 392–393 (1980). The provision, originally designated § 250.12, provides that a person who is loitering "under circumstances which justify suspicion that he may be engaged or about to engage in crime commits a violation if he refuses the request of a peace officer that he identify himself and give a reasonably credible account of the lawfulness of his conduct and purposes." § 250.12 (Tent. Draft No. 13) (1961). In some States, a suspect's refusal to identify himself is a misdemeanor offense or civil violation; in others, it is a factor to be considered in whether the suspect has violated loitering laws. In other States, a suspect may decline to identify himself without penalty.

Stop and identify statutes have their roots in early English vagrancy laws that required suspected vagrants to face arrest unless they gave "a good Account of themselves," 15 Geo. 2, ch. 5, § 2 (1744), a power that itself reflected common-law rights of private persons to "arrest any suspicious nightwalker, and detain him till he give a good account of himself . . . ." 2 W. Hawkins, Pleas of the Crown, ch. 13, § 6, p. 130 (6th ed. 1787). In recent decades, the Court has found constitutional infirmity in traditional vagrancy laws.

In *Papachristou* v. *Jacksonville,* 405 U. S. 156 (1972), the Court held that a traditional vagrancy law was void for vagueness. Its broad scope and imprecise terms denied proper notice to potential offenders and permitted police officers to exercise unfettered discretion in the enforcement of the law. See *id.,* at 167–171.

The Court has recognized similar constitutional limitations on the scope and operation of stop and identify statutes. In *Brown* v. *Texas,* 443 U. S. 47, 52 (1979), the Court invalidated a conviction for violating a Texas stop and identify statute on Fourth Amendment grounds. The Court ruled that the initial stop was not based on specific, objective facts establishing reasonable suspicion to believe the suspect was involved in criminal activity. See *id.,* at 51–52. Absent that factual basis for detaining the defendant, the Court held, the risk of "arbitrary and abusive police practices" was too great and the stop was impermissible. *Id.,* at 52. Four Terms later, the Court invalidated a modified stop and identify statute on vagueness grounds. See *Kolender* v. *Lawson,* 461 U. S. 352 (1983). The California law in *Kolender* required a suspect to give an officer " 'credible and reliable' " identification when asked to identify himself. *Id.,* at 360. The Court held that the statute was void because it provided no standard for determining what a suspect must do to comply with it, resulting in " 'virtually unrestrained power to arrest and charge persons with a violation.' " *Ibid.* (quoting *Lewis* v. *New Orleans,* 415 U. S. 130, 135 (1974) (Powell, J., concurring in result)).

The present case begins where our prior cases left off. Here there is no question that the initial stop was based on reasonable suspicion, satisfying the Fourth Amendment requirements noted in *Brown.* Further, the petitioner has not alleged that the statute is unconstitutionally vague, as in *Kolender.* Here the Nevada statute is narrower and more precise. The statute in *Kolender* had been interpreted to require a suspect to give the officer "credible and reliable"

identification. In contrast, the Nevada Supreme Court has interpreted NRS § 171.123(3) to require only that a suspect disclose his name. See 118 Nev., at 875, 59 P. 3d, at 1206 (opinion of Young, C. J.) ("The suspect is not required to provide private details about his background, but merely to state his name to an officer when reasonable suspicion exists"). As we understand it, the statute does not require a suspect to give the officer a driver's license or any other document. Provided that the suspect either states his name or communicates it to the officer by other means—a choice, we assume, that the suspect may make—the statute is satisfied and no violation occurs. See *id.*, at 876–877, 59 P. 3d, at 1206–1207.

## III

Hiibel argues that his conviction cannot stand because the officer's conduct violated his Fourth Amendment rights. We disagree.

Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *INS* v. *Delgado*, 466 U. S. 210, 216 (1984). Beginning with *Terry* v. *Ohio*, 392 U. S. 1 (1968), the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. *Delgado, supra,* at 216; *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 881 (1975). To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be " 'justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place.' " *United States* v. *Sharpe*, 470 U. S. 675, 682 (1985) (quoting *Terry, supra,* at 20). For example, the seizure can-

not continue for an excessive period of time, see *United States* v. *Place*, 462 U. S. 696, 709 (1983), or resemble a traditional arrest, see *Dunaway* v. *New York*, 442 U. S. 200, 212 (1979).

Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops. See *United States* v. *Hensley*, 469 U. S. 221, 229 (1985) ("[T]he ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice"); *Hayes* v. *Florida*, 470 U. S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information"); *Adams* v. *Williams*, 407 U. S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time").

Obtaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere. Identity may prove particularly important in cases such as this, where the police are investigating what appears to be a domestic assault. Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.

Although it is well established that an officer may ask a suspect to identify himself in the course of a *Terry* stop, it has been an open question whether the suspect can be ar-

rested and prosecuted for refusal to answer. See *Brown*, 443 U. S., at 53, n. 3. Petitioner draws our attention to statements in prior opinions that, according to him, answer the question in his favor. In *Terry*, Justice White stated in a concurring opinion that a person detained in an investigative stop can be questioned but is "not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest." 392 U. S., at 34. The Court cited this opinion in dicta in *Berkemer* v. *McCarty*, 468 U. S. 420, 439 (1984), a decision holding that a routine traffic stop is not a custodial stop requiring the protections of *Miranda* v. *Arizona*, 384 U. S. 436 (1966). In the course of explaining why *Terry* stops have not been subject to *Miranda*, the Court suggested reasons why *Terry* stops have a "nonthreatening character," among them the fact that a suspect detained during a *Terry* stop "is not obliged to respond" to questions. See *Berkemer*, *supra*, at 439, 440. According to petitioner, these statements establish a right to refuse to answer questions during a *Terry* stop.

We do not read these statements as controlling. The passages recognize that the Fourth Amendment does not impose obligations on the citizen but instead provides rights against the government. As a result, the Fourth Amendment itself cannot require a suspect to answer questions. This case concerns a different issue, however. Here, the source of the legal obligation arises from Nevada state law, not the Fourth Amendment. Further, the statutory obligation does not go beyond answering an officer's request to disclose a name. See NRS § 171.123(3) ("Any person so detained shall identify himself, but may not be compelled to answer any other inquiry of any peace officer"). As a result, we cannot view the dicta in *Berkemer* or Justice White's concurrence in *Terry* as answering the question whether a State can compel a suspect to disclose his name during a *Terry* stop.

The principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop. The rea-

sonableness of a seizure under the Fourth Amendment is determined "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Delaware* v. *Prouse,* 440 U. S. 648, 654 (1979). The Nevada statute satisfies that standard. The request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop. The threat of criminal sanction helps ensure that the request for identity does not become a legal nullity. On the other hand, the Nevada statute does not alter the nature of the stop itself: it does not change its duration, *Place, supra,* at 709, or its location, *Dunaway, supra,* at 212. A state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures.

Petitioner argues that the Nevada statute circumvents the probable-cause requirement, in effect allowing an officer to arrest a person for being suspicious. According to petitioner, this creates a risk of arbitrary police conduct that the Fourth Amendment does not permit. Brief for Petitioner 28–33. These are familiar concerns; they were central to the opinion in *Papachristou,* and also to the decisions limiting the operation of stop and identify statutes in *Kolender* and *Brown.* Petitioner's concerns are met by the requirement that a *Terry* stop must be justified at its inception and "reasonably related in scope to the circumstances which justified" the initial stop. 392 U. S., at 20. Under these principles, an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop. The Court noted a similar limitation in *Hayes,* where it suggested that *Terry* may permit an officer to determine a suspect's identity by compelling the suspect to submit to fingerprinting only if there is "a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime." 470 U. S., at 817. It is clear in this case that the

request for identification was "reasonably related in scope to the circumstances which justified" the stop. *Terry, supra,* at 20. The officer's request was a commonsense inquiry, not an effort to obtain an arrest for failure to identify after a *Terry* stop yielded insufficient evidence. The stop, the request, and the State's requirement of a response did not contravene the guarantees of the Fourth Amendment.

## IV

Petitioner further contends that his conviction violates the Fifth Amendment's prohibition on compelled self-incrimination. The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled. See *United States* v. *Hubbell,* 530 U. S. 27, 34–38 (2000).

Respondents urge us to hold that the statements NRS § 171.123(3) requires are nontestimonial, and so outside the Clause's scope. We decline to resolve the case on that basis. "[T]o be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe* v. *United States,* 487 U. S. 201, 210 (1988). See also *Hubbell,* 530 U. S., at 35. Stating one's name may qualify as an assertion of fact relating to identity. Production of identity documents might meet the definition as well. As we noted in *Hubbell,* acts of production may yield testimony establishing "the existence, authenticity, and custody of items [the police seek]." *Id.,* at 41. Even if these required actions are testimonial, however, petitioner's challenge must fail because in this case disclosure of his name presented no reasonable danger of incrimination.

The Fifth Amendment prohibits only compelled testimony that is incriminating. See *Brown* v. *Walker,* 161 U. S. 591, 598 (1896) (noting that where "the answer of the witness will not directly show his infamy, but only *tend* to disgrace him,

he is bound to answer"). A claim of Fifth Amendment privilege must establish

> " 'reasonable ground to apprehend danger to the witness from his being compelled to answer . . . . [T]he danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things,—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct.' " *Id.*, at 599–600 (quoting *Queen* v. *Boyes*, 1 B. & S. 311, 330, 121 Eng. Rep. 730, 738 (Q. B. 1861) (Cockburn, C. J.)).

As we stated in *Kastigar* v. *United States*, 406 U. S. 441, 445 (1972), the Fifth Amendment privilege against compulsory self-incrimination "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Suspects who have been granted immunity from prosecution may, therefore, be compelled to answer; with the threat of prosecution removed, there can be no reasonable belief that the evidence will be used against them. See *id.,* at 453.

In this case petitioner's refusal to disclose his name was not based on any articulated real and appreciable fear that his name would be used to incriminate him, or that it "would furnish a link in the chain of evidence needed to prosecute" him. *Hoffman* v. *United States*, 341 U. S. 479, 486 (1951). As best we can tell, petitioner refused to identify himself only because he thought his name was none of the officer's business. Even today, petitioner does not explain how the disclosure of his name could have been used against him in a criminal case. While we recognize petitioner's strong belief that he should not have to disclose his identity, the Fifth

Amendment does not override the Nevada Legislature's judgment to the contrary absent a reasonable belief that the disclosure would tend to incriminate him.

The narrow scope of the disclosure requirement is also important. One's identity is, by definition, unique; yet it is, in another sense, a universal characteristic. Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances. See *Baltimore City Dept. of Social Servs. v. Bouknight*, 493 U. S. 549, 555 (1990) (suggesting that "fact[s] the State could readily establish" may render "any testimony regarding existence or authenticity [of them] insufficiently incriminating"); cf. *California v. Byers*, 402 U. S. 424, 432 (1971) (opinion of Burger, C. J.). In every criminal case, it is known and must be known who has been arrested and who is being tried. Cf. *Pennsylvania v. Muniz*, 496 U. S. 582, 601–602 (1990) (principal opinion of Brennan, J.). Even witnesses who plan to invoke the Fifth Amendment privilege answer when their names are called to take the stand. Still, a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense. In that case, the court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow. We need not resolve those questions here.

The judgment of the Nevada Supreme Court is

*Affirmed.*

JUSTICE STEVENS, dissenting.

The Nevada law at issue in this case imposes a narrow duty to speak upon a specific class of individuals. The class includes only those persons detained by a police officer "under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a

crime"[1]—persons who are, in other words, targets of a criminal investigation. The statute therefore is directed not "at the public at large," but rather "at a highly selective group inherently suspect of criminal activities." *Albertson* v. *Subversive Activities Control Bd.*, 382 U. S. 70, 79 (1965).

Under the Nevada law, a member of the targeted class "may not be compelled to answer" any inquiry except a command that he "identify himself."[2] Refusal to identify oneself upon request is punishable as a crime.[3] Presumably the statute does not require the detainee to answer any other question because the Nevada Legislature realized that the Fifth Amendment prohibits compelling the target of a criminal investigation to make any other statement. In my judgment, the broad constitutional right to remain silent, which derives from the Fifth Amendment's guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself,"[4] is not as circumscribed as the Court suggests, and does not admit even of the narrow exception defined by the Nevada statute.

"[T]here can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda* v. *Arizona*, 384 U. S. 436, 467 (1966). It is a "settled principle" that "the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes," but

---

[1] Nev. Rev. Stat. § 171.123(1) (2003).

[2] § 171.123(3).

[3] In this case, petitioner was charged with violating § 199.280, which makes it a crime to "willfully resis[t], dela[y] or obstruc[t] a public officer in discharging or attempting to discharge any legal duty of his office." A violation of that provision is a misdemeanor unless a dangerous weapon is involved.

[4] The Fifth Amendment's protection against compelled self-incrimination applies to the States through the Fourteenth Amendment's Due Process Clause. See *Malloy* v. *Hogan*, 378 U. S. 1, 6 (1964).

"they have no right to compel them to answer." *Davis* v. *Mississippi*, 394 U. S. 721, 727, n. 6 (1969). The protections of the Fifth Amendment are directed squarely toward those who are the focus of the government's investigative and prosecutorial powers. In a criminal trial, the indicted defendant has an unqualified right to refuse to testify and may not be punished for invoking that right. See *Carter* v. *Kentucky*, 450 U. S. 288, 299–300 (1981). The unindicted target of a grand jury investigation enjoys the same constitutional protection even if he has been served with a subpoena. See *Chavez* v. *Martinez*, 538 U. S. 760, 767–768 (2003). So does an arrested suspect during custodial interrogation in a police station. *Miranda*, 384 U. S., at 467.

There is no reason why the subject of police interrogation based on mere suspicion, rather than probable cause, should have any lesser protection. Indeed, we have said that the Fifth Amendment's protections apply with equal force in the context of *Terry* stops, see *Terry* v. *Ohio*, 392 U. S. 1 (1968), where an officer's inquiry "must be 'reasonably related in scope to the justification for [the stop's] initiation,'" *Berkemer* v. *McCarty*, 468 U. S. 420, 439 (1984) (some internal quotation marks omitted). "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond." *Ibid.* See also *Terry*, 392 U. S., at 34 (White, J., concurring) ("Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation"). Given our statements to the effect that citizens are not required to respond to police officers' questions during a *Terry* stop, it is no surprise that petitioner assumed, as have we, that he had a right not to disclose his identity.

The Court correctly observes that a communication does not enjoy the Fifth Amendment privilege unless it is testi-

monial. Although the Court declines to resolve this question, *ante*, at 189, I think it clear that this case concerns a testimonial communication. Recognizing that whether a communication is testimonial is sometimes a "difficult question," *Doe* v. *United States*, 487 U. S. 201, 214–215 (1988), we have stated generally that "[i]t is the 'extortion of information from the accused,' the attempt to force him 'to disclose the contents of his own mind,' that implicates the Self-Incrimination Clause," *id.*, at 211 (citations omitted). While "[t]he vast majority of verbal statements thus will be testimonial and, to that extent at least, will fall within the privilege," *id.*, at 213–214, certain acts and physical evidence fall outside the privilege.[5] In all instances, we have afforded Fifth Amendment protection if the disclosure in question was being admitted because of its content rather than some other aspect of the communication.[6]

Considered in light of these precedents, the compelled statement at issue in this case is clearly testimonial. It is significant that the communication must be made in response

---

[5] A suspect may be made, for example, to provide a blood sample, *Schmerber* v. *California*, 384 U. S. 757, 765 (1966), a voice exemplar, *United States* v. *Dionisio*, 410 U. S. 1, 7 (1973), or a handwriting sample, *Gilbert* v. *California*, 388 U. S. 263, 266–267 (1967).

[6] See *Pennsylvania* v. *Muniz*, 496 U. S. 582, 598–599 (1990) (respondent's answer to the "birthday question" was protected because the "content of his truthful answer supported an inference that his mental faculties were impaired"); *Doe* v. *United States*, 487 U. S. 201, 211, n. 10 (1988) ("The content itself must have testimonial significance"); *Fisher* v. *United States*, 425 U. S. 391, 410–411 (1976) ("[H]owever incriminating the contents of the accountant's workpapers might be, the act of producing them—the only thing which the taxpayer is compelled to do—would not itself involve testimonial self-incrimination"); *Gilbert*, 388 U. S., at 266–267 ("A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection"); *United States* v. *Wade*, 388 U. S. 218, 223 (1967) ("[I]t deserves emphasis that this case presents no question of the admissibility in evidence of anything Wade said or did at the lineup which implicates his privilege").

to a question posed by a police officer. As we recently explained, albeit in the different context of the Sixth Amendment's Confrontation Clause, "[w]hatever else the term ['testimonial'] covers, it applies at a minimum . . . to police interrogations." *Crawford* v. *Washington*, 541 U. S. 36, 68 (2004). Surely police questioning during a *Terry* stop qualifies as an interrogation, and it follows that responses to such questions are testimonial in nature.

Rather than determining whether the communication at issue is testimonial, the Court instead concludes that the State can compel the disclosure of one's identity because it is not "incriminating." *Ante*, at 189. But our cases have afforded Fifth Amendment protection to statements that are "incriminating" in a much broader sense than the Court suggests. It has "long been settled that [the Fifth Amendment's] protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence." *United States* v. *Hubbell*, 530 U. S. 27, 37 (2000). By "incriminating" we have meant disclosures that "could be used in a criminal prosecution or could lead to other evidence that might be so used," *Kastigar* v. *United States*, 406 U. S. 441, 445 (1972)—communications, in other words, that "would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime," *Hoffman* v. *United States*, 341 U. S. 479, 486 (1951). Thus, "[c]ompelled testimony that communicates information that may 'lead to incriminating evidence' is privileged even if the information itself is not inculpatory." *Hubbell*, 530 U. S., at 38 (quoting *Doe*, 487 U. S., at 208, n. 6).

Given a proper understanding of the category of "incriminating" communications that fall within the Fifth Amendment privilege, it is clear that the disclosure of petitioner's identity is protected. The Court reasons that we should not assume that the disclosure of petitioner's "name would be used to incriminate him, or that it would furnish a link in [a]

chain of evidence needed to prosecute him." *Ante,* at 190 (internal quotation marks omitted). But why else would an officer ask for it? And why else would the Nevada Legislature require its disclosure only when circumstances "reasonably indicate that the person has committed, is committing or is about to commit a crime"?[7] If the Court is correct, then petitioner's refusal to cooperate did not impede the police investigation. Indeed, if we accept the predicate for the Court's holding, the statute requires nothing more than a useless invasion of privacy. I think that, on the contrary, the Nevada Legislature intended to provide its police officers with a useful law enforcement tool, and that the very existence of the statute demonstrates the value of the information it demands.

A person's identity obviously bears informational and incriminating worth, "even if the [name] itself is not inculpatory." *Hubbell,* 530 U. S., at 38. A name can provide the key to a broad array of information about the person, particularly in the hands of a police officer with access to a range of law enforcement databases. And that information, in turn, can be tremendously useful in a criminal prosecution. It is therefore quite wrong to suggest that a person's identity provides a link in the chain to incriminating evidence "only in unusual circumstances." *Ante,* at 191.

The officer in this case told petitioner, in the Court's words, that "he was conducting an investigation and needed to see some identification." *Ante,* at 181. As the target of that investigation, petitioner, in my view, acted well within his rights when he opted to stand mute. Accordingly, I respectfully dissent.

---

[7] Nev. Rev. Stat. § 171.123(1) (2003). The Court suggests that furnishing identification also allows the investigating officer to assess the threat to himself and others. See *ante,* at 186. But to the extent that officer or public safety is immediately at issue, that concern is sufficiently alleviated by the officer's ability to perform a limited patdown search for weapons. See *Terry* v. *Ohio,* 392 U. S. 1, 25–26 (1968).

JUSTICE BREYER, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

Notwithstanding the vagrancy statutes to which the majority refers, see *ante*, at 183–184, this Court's Fourth Amendment precedents make clear that police may conduct a *Terry* stop only within circumscribed limits. And one of those limits invalidates laws that compel responses to police questioning.

In *Terry* v. *Ohio*, 392 U. S. 1 (1968), the Court considered whether police, in the absence of probable cause, can stop, question, or frisk an individual at all. The Court recognized that the Fourth Amendment protects the "'right of every individual to the possession and control of his own person.'" *Id.*, at 9 (quoting *Union Pacific R. Co.* v. *Botsford*, 141 U. S. 250, 251 (1891)). At the same time, it recognized that in certain circumstances, public safety might require a limited "seizure," or stop, of an individual against his will. The Court consequently set forth conditions circumscribing when and how the police might conduct a *Terry* stop. They include what has become known as the "reasonable suspicion" standard. 392 U. S., at 20–22. Justice White, in a separate concurring opinion, set forth further conditions. Justice White wrote: "Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." *Id.*, at 34.

About 10 years later, the Court, in *Brown* v. *Texas*, 443 U. S. 47 (1979), held that police lacked "any reasonable suspicion" to detain the particular petitioner and require him to identify himself. *Id.*, at 53. The Court noted that the trial judge had asked the following: "'I'm sure [officers conducting a *Terry* stop] should ask everything they possibly could find out. *What I'm asking is what's the State's interest in putting a man in jail because he doesn't want to answer . . . .'*" *Id.*, at 54 (Appendix to opinion of the Court) (emphasis in

original).   The Court referred to Justice White's *Terry* concurrence.   443 U. S., at 53, n. 3.   And it said that it "need not decide" the matter.   *Ibid.*

Then, five years later, the Court wrote that an "officer may ask the *[Terry]* detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.   *But the detainee is not obliged to respond.*"   *Berkemer* v. *McCarty,* 468 U. S. 420, 439 (1984) (emphasis added).   See also *Kolender* v. *Lawson,* 461 U. S. 352, 365 (1983) (Brennan, J., concurring) (*Terry* suspect "must be free to . . . decline to answer the questions put to him"); *Illinois* v. *Wardlow,* 528 U. S. 119, 125 (2000) (stating that allowing officers to stop and question a fleeing person "is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning").

This lengthy history—of concurring opinions, of references, and of clear explicit statements—means that the Court's statement in *Berkemer,* while technically dicta, is the kind of strong dicta that the legal community typically takes as a statement of the law.   And that law has remained undisturbed for more than 20 years.

There is no good reason now to reject this generation-old statement of the law.   There are sound reasons rooted in Fifth Amendment considerations for adhering to this Fourth Amendment legal condition circumscribing police authority to stop an individual against his will.   See *ante,* at 192–196 (STEVENS, J., dissenting).   Administrative considerations also militate against change.   Can a State, in addition to requiring a stopped individual to answer "What's your name?" also require an answer to "What's your license number?" or "Where do you live?"   Can a police officer, who must know how to make a *Terry* stop, keep track of the constitutional answers?   After all, answers to any of these questions may, or may not, incriminate, depending upon the circumstances.

Indeed, as the Court points out, a name itself—even if it is not "Killer Bill" or "Rough 'em up Harry"—will sometimes provide the police with "a link in the chain of evidence needed to convict the individual of a separate offense." *Ante*, at 191. The majority reserves judgment about whether compulsion is permissible in such instances. *Ibid.* How then is a police officer in the midst of a *Terry* stop to distinguish between the majority's ordinary case and this special case where the majority reserves judgment?

The majority presents no evidence that the rule enunciated by Justice White and then by the *Berkemer* Court, which for nearly a generation has set forth a settled *Terry*-stop condition, has significantly interfered with law enforcement. Nor has the majority presented any other convincing justification for change. I would not begin to erode a clear rule with special exceptions.

I consequently dissent.