RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TERRY GRECO,

*Plaintiff-Appellee,*

No. 14-1203

*v.*

LIVINGSTON COUNTY and ANTHONY CLAYTON,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-12212—Denise Page Hood, District Judge.

Decided and Filed:  December 19, 2014

Before:  SILER, SUTTON, and STRANCH, Circuit Judges.

_____

**COUNSEL**

_____

**ON BRIEF:**  Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellants.  Christopher P. Desmond, Detroit, Michigan, for Appellee.

SUTTON, J., delivered the opinion of the court in which SILER J., joined, and STRANCH, J., joined in the judgment.

_____

**OPINION**

_____

SUTTON, Circuit Judge.   During a search and rescue gone awry, Deputy Anthony Clayton's dog sunk its teeth into the woman he was looking for.  Up for debate is whether Clayton "sicked the dog" on Terry Greco (her words) or whether the attack was an "unintended byproduct of that search" (his).  At this phase of the case, we need not choose whom to believe;

1

the summary judgment standard picks the appropriate viewpoint for us. Looking at the situation in the light most favorable to Greco, we affirm the district court's denial of qualified immunity.

*Rashōmon* and Rule 56 of the Federal Rules of Civil Procedure rarely take the stage together. But the conflicting accounts of this dog biting show that Akira Kurosawa and the authors of Civil Rule 56 shared an insight: that different people sometimes see the same event differently, whether due to different vantage points or self-interest.

What happened here starts with some agreement. All agree that Terry Greco began the evening of September 30, 2012, with some wine at a conference reception. On her way home, Greco managed to drive her car into a ditch. Tipsy but unharmed, Greco clambered in flip-flops to a nearby gas station where she met two emergency medical technicians refueling their ambulance. They smelled alcohol on her breath and threatened to call the police, prompting Greco to flee behind the station.

After the EMTs called in a possible DWI, Deputy Anthony Clayton entered the scene. He arrived with his canine, Diago, a few other officers, and a civilian "ride along" named Curtis Stuart. The EMTs told Clayton what had happened, and he instructed Diago to track Greco. At this point, the storylines diverge.

In Clayton's version, he began the search concerned about Greco's wellbeing. Despite "the extreme cold and wet weather that day," the EMTs reported that Greco was wearing nothing warmer than sandals, a short-sleeved shirt, and a nametag with "Terry" scrawled on it. R. 37-3 at 542, 554. Clayton also thought she might be injured, judging by the car's angle in the ditch. He announced his and Diago's presence and entered what he calls a "swamp area" by the gas station to find her. *Id.* at 555.

"All hell broke loose," Clayton says, when he slipped on a log and fell "almost on top of Ms. Greco." *Id.* at 546, 562. He looked up at her feet and heard screaming as Diago clamped down on her leg. Rising, Clayton "approached calmly" and waited for Greco to "stop[] moving" so he could "see her hands" and ensure they were weaponless. *Id.* at 563. After about "10 to 20 seconds," Clayton released Diago from her leg and summoned the EMTs to carry Greco into the refueled ambulance. *Id.* at 564.

Greco tells a different story.  After her initial encounter with the gas-station EMTs, Greco ran to some "bushes" next to "a huge open field"—scared, alone, and needing to pee.  R. 37-1 at 462.  She was still squatting when two men approached with a flashlight and a dog, shouting "police department," "put your hands on your head."  *Id.*  She was barely able to comply before Clayton "sicked the dog on [her] leg."  *Id.*  Screaming, she dropped and tried to protect herself, but the dog held on for more than twenty seconds.

Clayton's "ride along" companion Curtis Stuart tells a third account that blends elements of the first two with additional flavor.  He agrees with Clayton that the "woods" were "extremely slippery" and "Deputy Clayton trip[ped] a few times."  R. 37-2 at 499.  He agrees with Greco that, when the officers found her "sitting" on some "rocks," they "started yelling, you know, put your hands up, put your hands up."  *Id.*  He adds that Greco was belligerent, calling the officers "Nazis" and "laying on her back kicking her feet towards the dog."  *Id.*  He guesses "the dog went at her leg because she was continuing to kick at [it]."  *Id.*

Whatever happened in the "swamp"/"field"/"woods" that night, one thing is clear:  Greco emerged with a nasty injury to her thigh courtesy of Diago.  She sued Clayton and the Livingston County Sheriff's Department, raising several constitutional and state-law tort claims.  The district court denied the defendants' motion for summary judgment on qualified immunity grounds, holding that a jury could reasonably believe that Clayton intentionally detained Greco with an unconstitutional level of force.  The defendants filed this interlocutory appeal.

The qualified immunity defense protects officers like Clayton from both liability and trial so long as they do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When deciding whether an officer violated such a clearly established right, we may not call off the trial merely because an officer *says* he or she acted reasonably in the face of competing testimony.  We instead consider the facts in the light most favorable to the plaintiff.  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014).

The constitutional right at issue—the Fourth Amendment—protects people like Greco from "seizures" that are not "reasonable" or detentions that involve the misuse of power.  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  To be a seizure, the detention must be intentional.

*Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989).  To be reasonable, the detention must be proportionate to "the severity of the crime at issue" as well as to "whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). An apprehension by a police dog or a delay in calling off the dog may rise to the level of an unreasonable seizure. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 787 (6th Cir. 2012).

Clayton contends that he never seized Greco.  The dog bit Greco only after he fell on a log, says Clayton, meaning it was an unintentional accident unprotected by the Fourth Amendment. R. 28; R. 42.  That is where the "light most favorable to the [plaintiff]" language kicks in:  Even if the district court (or we) believed Clayton, the question remains whether a *jury* could reasonably decide that Clayton "sicked the dog" on Greco.  *Plumhoff*, 134 S. Ct. at 2017. We agree with the district court that it could.  Based on Greco and Stuart's testimony, a jury could reasonably conclude that Clayton found Greco and told her to put her hands on her head before the dog attacked, suggesting that the detention-by-canine was no slip-up.  And even if Diago's initial bite had been an accident, the jury could consider Clayton's twenty-plus second delay in removing Diago an intentional seizure as well.

That should be that.  We have considered the argument Clayton raised before the district court and found it without merit.  On appeal, however, Clayton argues for the first time that, even if he did intentionally seize Greco, any use of force was reasonable.  This new argument trips over the forfeiture rule, which tells us to correct errors raised and addressed below, not to entertain new claims raised for the first time on appeal. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).  By failing to make any reasonableness argument in district court, Clayton has forfeited it here.

There is some leeway, it is true, in deciding whether to review a forfeited argument.  But "[w]e have rarely exercised such discretion," *id.*, and we decline to do so now.  On remand, Clayton may try to convince the district court (or jury) that Diago's attack was a reasonable application of force in light of the "severity" of the crime, the potential threat she posed to officers, and her "attempt[] to evade arrest" by hiding in some bushes. (Or on some rocks.  Or in a swamp.) *See Graham*, 490 U.S. at 396.  We likewise decline to exercise pendent appellate

jurisdiction over Livingston County's defenses until the district court issues a final reviewable judgment.  *See* 28 U.S.C. § 1291; *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013).

For these reasons, we affirm.