RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0069p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

FAMILY SERVICE ASSOCIATION ex rel. James W. Coil, II,

                    *Plaintiff-Appellee*,

    *v.*

WELLS TOWNSHIP, et al.,

                    *Defendants*,

JEFFREY JAMES KAMERER,

                    *Defendant-Appellant*.

No. 14-4020

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00135—Michael H. Watson, District Judge.

Decided and Filed:  April 16, 2015

Before:  NORRIS, SUTTON, and DONALD, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:**  Gregory A. Beck, BAKER, DUBLIKAR, BECK, WILEY & MATHEWS, North Canton, Ohio, for Appellant.  Neal E. Shapero, Abby L. Botnick, SHAPERO ROLOFF CO., LPA, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge.  Christmas Day 2011 was an unfortunate day for Jimmy Coil and Officer J.J. Kamerer.  At around 10:00 p.m. that night, Coil and his boyfriend Barry Starcher

1

were walking home from a friend's house in Brilliant, Ohio.  They stopped for a moment to rest near a gas station.  While they sat on a guardrail along the Third Street exit from State Route 7, Officer J.J. Kamerer approached them in his police cruiser.  Concerned for their safety, Kamerer asked if anything was wrong.

What happened next remains a mystery—in part.  According to Starcher, he and Coil told Officer Kamerer that nothing was wrong and that they were heading home.  Kamerer asked for their names, but Starcher hesitated to answer.  "I'm not sure I should give you that," he replied. R. 44-1 at 22.  "What do you need that for?" he added.  R. 45-1 at 8.  Coil then got up and started walking away, saying he was going home.  That caused Kamerer to "go[] off on [them] like a crazy person."  *Id.*  Kamerer jumped out of the cruiser after Coil, screaming in his face, "You better do what the f[**]k I tell you when I tell you!  You're going to give me your f[**]king name or I'm going to put you down on the ground!"  *Id.*; R. 44-1 at 27.  The men gave their names.  Coil handed the officer a prescription bottle to prove who he was and turned to go, yelling "Police brutality!" as he walked away a second time.  R. 44-1 at 34.  Kamerer ordered Coil to stop and held his flashlight up as he approached Coil as if to hit him.  After Coil held out his arms "to protect himself," he and the officer began "grabbing at each other."  *Id.* at 39; R. 45-1 at 45.  Coil never hit Kamerer.  The same was not true in the other direction.  Kamerer "slammed" Coil to the ground, pepper-sprayed him, and left him handcuffed facedown in the street.  R. 44-1 at 46.

During the scuffle, Starcher says he stood just a step or two behind Officer Kamerer, pleading with him not to hurt Coil and trying to separate the two.  Starcher never hit Kamerer either.  That also did not make a difference.  As soon as Kamerer was done with Coil, he whipped around and pepper-sprayed Starcher, forcing him back several feet to the neighboring grass.  The next thing Starcher remembers is opening his eyes and seeing Kamerer running back to the road and getting hit, along with Coil, by an oncoming SUV.

Officer Kamerer gives a different account.  After he asked whether everything was alright, Coil and Starcher "began cussing" and "bec[ame] combative toward [him]."  R. 42-1 at 28.  They told him to "get the f[**]k away" and would not calm down.  *Id.*  After Coil shoved him, Kamerer told Coil that he was under arrest and asked each man for his identification.  They

refused and became "combative." *Id.* at 29. Coil threw a pill bottle at the officer and said, "There's my f[**]king ID!" *Id.* He then "charg[ed]" Kamerer "like a football player." *Id.* Starcher joined in, and the two men slapped, punched, and pushed him "all the way up the road." *Id.* at 57. When Kamerer tried to handcuff Coil on the ground, Starcher continued to punch and slap the back of his head. After pepper-spraying Coil, Kamerer briefly left him handcuffed facedown "in the road" to spray and tackle Starcher, who charged as soon as Kamerer stood up. *Id.* at 31. "Within seconds," he returned to retrieve Coil from the road, and a car struck both of them. *Id.* at 33. Kamerer radioed for help.

Cynthia Devore, who lived nearby, witnessed some of the incident. She confirmed that it was a dark night, that Coil had dark clothes on, and that Kamerer's cruiser did not have its flashing or regular lights on. She saw "two men fighting in the middle of the street." R. 46-1 at 17. Officer Kamerer already had Coil on the ground, but Starcher was lightly "pushing at" Kamerer's back to get him away from Coil. *Id.* at 24, 69. After the officer handcuffed Coil and got Starcher to back away from him, Devore saw headlights coming down the road. Kamerer rushed back to the road to grab Coil, and as soon the officer stood Coil on his feet the car struck them both.

The crash caused a severe traumatic brain injury to Coil, leaving him with limited cognitive function and requiring around-the-clock care for the rest of his days. Kamerer broke his left shoulder and two bones in his left leg, and it took 30 days in a hospital to recover from his injuries. The Family Service Association, Coil's legal guardian, filed this § 1983 action against Officer Kamerer on Coil's behalf, alleging a baseless seizure in violation of the Fourth Amendment and deliberate indifference to his safety in violation of the Fourteenth Amendment. Officer Kamerer moved for summary judgment on qualified immunity grounds. The district court denied the motion. It ruled that a reasonable jury could find that Kamerer unconstitutionally seized Coil without reasonable suspicion based on Starcher's account of the evening's events. And it ruled that a reasonable jury could find that Kamerer was deliberately indifferent to Coil's safety based on Starcher's account as well as the length of time Kamerer left Coil handcuffed and facedown in the road.

A few familiar principles orient this appeal. Qualified immunity protects Officer Kamerer from this lawsuit unless Coil establishes that Kamerer violated his constitutional rights and that those rights were clearly established. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Officer Kamerer is entitled to summary judgment if no reasonable jury could find in Coil's favor. *See* Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And Coil receives the benefit of the doubt in assessing the factual record. In considering whether an officer violated a citizen's constitutional rights, we "may not call off the trial merely because an officer *says* he or she acted reasonably in the face of competing testimony. We instead consider the facts in the light most favorable to the plaintiff." *Greco v. Livingston Cnty.*, 774 F.3d 1061, 1064 (6th Cir. 2014).

*Fourth Amendment improper seizure claim.* Officer Kamerer's seizure of Coil implicates several cornerstones of Fourth Amendment law. Police officers may not stop citizens minding their own business on a public street in the absence of reasonable suspicion that they have committed, or are about to commit, a crime, *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968), and they may not arrest them in the absence of probable cause that they have committed a crime, *Henry v. United States*, 361 U.S. 98, 102 (1959). Unsuspicious pedestrians remain free "to ignore the police and go about [their] business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). And "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991). All of this establishes that "walking away from an officer does not create . . . reasonable suspicion." *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011); *see Brown v. Texas*, 443 U.S. 47, 52 (1979).

A jury could reasonably believe that Kamerer did not adhere to these requirements during his encounter with Coil. According to Starcher's account of the evening, Coil never committed a crime or gave Kamerer any reason to think he had. Sitting on a guardrail is not illegal. Doing so at night, whether on Christmas night or any other, does not transform this innocent activity into nefarious conduct. Walking away from an officer without answering his questions or revealing one's name does not establish reasonable suspicion for a *Terry* stop. And an individual's late-night presence in a high-crime area by itself does not establish reasonable suspicion of anything

other than the probability that the individual lives in a high-crime area. That leaves the absence of a nearby car or any open store or business that might explain the men's presence. But walking without evident purpose remains an innocent, even enjoyable, activity in this country, whether in a high-crime area or a suburban park. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163–64, 171 (1972). Even after considering "the whole picture," *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), no reasonable officer could find a basis to stop Coil, let alone probable cause to arrest him on this record. *See United States v. Johnson*, 620 F.3d 685, 692–95 (6th Cir. 2010).

What of the officer's testimony that Coil hit him during the encounter and attempted to flee afterwards? The problem is, it is just that—the officer's testimony—and it does not stand alone. Starcher denies that Coil reacted violently or attempted to flee. From his vantage point, Coil never hit the officer and only walked away—"'the opposite' of flight." *Id.* at 695 (quoting *Wardlow*, 528 U.S. at 125). Whether *we* believe Starcher or not makes no difference because a *jury* reasonably could believe him. "At this phase of the case, we need not choose whom to believe; the summary judgment standard picks the appropriate viewpoint for us." *Greco*, 774 F.3d at 1062.

What of *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 187–88 (2004), which held that officers sometimes may compel individuals to give their names? *Hiibel* held that States may require suspects to disclose their names "in the course of a valid *Terry* stop." *Id.* at 188. What makes a *Terry* stop valid is reasonable suspicion—something that existed in *Hiibel* but did not exist here. *Hiibel* indeed relied on the quarter-century-old holding of *Brown v. Texas* that police may not detain pedestrians to obtain their identity without "specific, objective facts establishing reasonable suspicion [of] criminal activity." *Id.* at 184 (citing *Brown*, 443 U.S. at 51–52). Because a jury could reasonably believe that Coil did nothing suspicious that evening, Coil had a clearly established right to refuse Kamerer's questions.

What of Kamerer's allegation that *Starcher* resembled a suspect wanted by police? Kamerer forfeited the argument by failing to raise it before the district court. *See Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005). *Starcher's* likeness at any rate cannot support the officer's seizure of *Coil*. "[M]ere propinquity to others independently suspected of

criminal activity does not, without more," support a *Terry* stop or a seizure. *Ybarra v. Illinois*, 444 U.S. 85, 91–93 (1979); *see Sibron v. New York*, 392 U.S. 40, 63–64 (1968). The district court properly allowed this claim to go to a jury.

*Fourteenth Amendment substantive due process claim.* The state-action requirement of the Fourteenth Amendment means that the Due Process Clause does not impose liability on the State when one private individual injures another. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). But when the State takes an individual into custody—into its control—substantive due process prevents state actors from intentionally or recklessly injuring the individual, whether that individual has been temporarily seized by an officer or is more permanently housed in a prison. *See Collins v. City of Harker Heights*, 503 U.S. 115, 127–28 (1992); *Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998). Where an arrestee suffers injury at the hands of a private party while detained by the State, "a constitutional claim arises when the injury occurred as a result of the state's deliberate indifference to the risk of such an injury." *Davis*, 143 F.3d at 1026; *see Stemler v. City of Florence*, 126 F.3d 856, 870 (6th Cir. 1997). *Davis* and *Stemler* illustrate the contours of the rule: *Davis* held that a jury could infer deliberate indifference when the police took a drunk individual into custody, then abandoned him on a dark, busy highway, and an accident resulted. 143 F.3d at 1026–27. *Stemler* held that a jury could infer deliberate indifference when the police forced a woman, under threat of arrest, to drive off with her obviously drunk boyfriend, and an accident resulted. 126 F.3d at 867–70.

The record in this case permits a reasonable inference of deliberate indifference. Officer Kamerer took Coil into custody. He then left him facedown, pepper-sprayed and handcuffed, in the middle of a lane open to traffic. Why he felt the need to leave him in the middle of the street in such a state is difficult to fathom. The area was dark. Coil wore dark clothing. Kamerer had not turned his police car's regular or flashing lights on. If Coil remained there for any appreciable amount of time, the risk that Coil might get struck by a passing car was painfully obvious. And the 911 dispatch recordings show a two-minute gap between when Kamerer radioed that he had both men "chemically restrained" and when he called for an ambulance, which occurred "immediately" after the car struck him and Coil. *See* R. 42-1 at 34; R. 55 (recording). During that window Kamerer faced no threat, and common experience and common

sense suggested a strong likelihood that a car might pass—and its driver would not be able to see Coil.

What of Kamerer's statement that he was unsure at the time whether he had left Coil in the road or the nearby grass?  The obvious difference between asphalt and grass, together with the officer's failure to check on Coil for over two minutes after he had restrained Starcher, would allow a jury to infer deliberate indifference to the risk he had created.  *Cf. Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005).

What of the reality that Kamerer could not have meant to injure Coil given that he exposed *himself* to serious injury—and indeed was seriously injured—when he raced back into the road to try to save Coil from the approaching car?  No doubt, this feature of the case shows that, when the officer realized what he had done, he quickly and bravely tried to remove Coil from harm's way.  But it does not eliminate the possibility that the officer behaved recklessly, as opposed to negligently, in handcuffing Coil facedown in the street.  That is precisely the kind of question—did the officer behave recklessly (creating liability) or negligently (preventing liability)—that we expect juries, as opposed to judges, to answer.

What of *Lombardo v. Ernst*, No. 14-1216, 2014 WL 7243329 (6th Cir. Dec. 22, 2014), which rejected a claim by a suspect who was hit by a car during an officer's mid-street arrest?  The key problem with the officer's reliance on this unpublished decision is that the plaintiff in that case, not the officer, "put himself in the street[]."  *Id*. at *4 n.1.  Here by contrast the officer pepper-sprayed Coil, took him from a place of safety to the street, handcuffed him behind his back, and left him in the street.  Nor was this such a fast-paced encounter that the officer had no time to deliberate—no time in other words to be deliberately indifferent to Coil's safety.  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853–54 (1998) (holding that higher standard of fault applies only when "unforeseen circumstances demand an officer's instant judgment").  Officer Kamerer did not suddenly face an out-of-control driver that he suddenly had to chase.  By Starcher's account, both individuals were minding their own business when the officer initiated the encounter—and created the peril.  Officer Kamerer had ample time at each step along the way to avoid the risk he created.

That would be the end of this appeal but for one loose end. Coil claims we should dismiss this interlocutory appeal for want of jurisdiction rather than affirm the district court's decision. *See Johnson v. Jones*, 515 U.S. 304 (1995). Coil takes a narrow jurisdictional requirement and tries to turn it into something it is not. *Johnson* applies to interlocutory appeals that solely contest the plaintiff's account of the facts. *Id.* at 319–20. That is not this case. Officer Kamerer maintains that, even "accept[ing] a review of the record in a light most favorable to [Coil]," his conduct still does not violate the Fourth or Fourteenth Amendments. Reply Br. at 3. He may be wrong on the merits but that does not deny us jurisdiction to say so— or for that matter deny Coil the *benefit* of a merits ruling that establishes on this record that a jury reasonably could rule for him. Appeals contesting whether the undisputed facts support reasonable suspicion or deliberate indifference do not run afoul of *Johnson*. *See Gardenhire v. Schubert*, 205 F.3d 303, 312 (6th Cir. 2000) (reasonable suspicion); *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc) (deliberate indifference). And in this setting *Johnson* does not prevent appellate courts from performing their customary function of determining whether a material fact dispute precludes summary judgment. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).

For these reasons, we affirm.