BARKETT, Circuit Judge,
dissenting:
I dissent because I believe that the police lacked reasonable suspicion to seize Anthony Lindsey at gunpoint, and that his extended, handcuffed detention thus amounted to an unlawful search and seizure.
Officers conducting “stop and frisk” seizures must “have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity.” United States v. Powell, 222 F.3d 913, 917 (11th Cir.2000). To determine whether reasonable suspicion existed to justify a stop, we must look only to the information that the police had at the moment of detention, not that which was discovered after the fact.
In this case, there was no “reasonable, articulable suspicion based on objective facts” that Anthony Lindsey had engaged in, or was about to engage in, criminal activity when he was stopped. The purported reasonable suspicion arose solely from a tip delivered by an anonymous caller, who, although he said his name was “Davis,” was completely unknown to the police. The anonymous tipster reported that four black men were loading guns into a white SUV in the parking lot of a Mobil gas station across the street from a Wa-chovia bank. This tip was virtually identical to the tip which the Supreme Court found to be insufficient to support a Terry stop in Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In J.L., an unidentified tipster reported that a young black man wearing a plaid shirt was sitting at a bus stop and was carrying a gun. The Court explicitly found that a stop and frisk based on this tip was illegal because the officers’ suspicion “arose not from any observations of their own,” id. at 270, 120 S.Ct. 1375, but rather from the anonymous tip. The Court made its holding unmistakably clear: “The question presented in this ease is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer’s stop and frisk of that person. We hold that it is not.” Id. at 268, 120 S.Ct. 1375.
The Court held that such a tip was insufficient to permit even a Terry investigatory stop because it was not reliable. The requisite reliability of a tip sufficient to support suspicion that a crime is about to be committed has to be satisfied in one of two ways. Either the tip must come from a “known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated.” Id. at 270, 120 S.Ct. 1375 (emphasis added) (quotation and citation omitted). Or the content of the tip must include accurate predictive information which is verified by the subsequent observations of the detaining officer. Id. at 271, 120 S.Ct. 1375. That is, the tip itself must show that the tipster has sufficient familiarity with the fact that criminal activity “may be afoot,” in that the tipster is able to relate the future movements or actions of the prospective detainee that are not easily predictable, and which the police verify through independent observation before the stop. In either case, police must have some way to assess whether the information given in the tip is sufficiently reliable for constitutional purposes to justify a police seizure.
In the first instance, if an informant is “known,” police can be reasonably satisfied that the tip is reliable based on the informant’s past delivery of accurate informa *1296 tion. See Adams v. Williams, 407 U.S. 143, 148-49, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (sustaining a Terry stop undertaken on the basis of a tip given in person by a known informant who had provided accurate information in the past); see also Alabama v. White, 496 U.S. 325, 328, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (citing Adams, 407 U.S. at 146-47, 92 S.Ct. 1921). Moreover, informants with known identities can be held accountable if the information they provide is false or intentionally misleading, J.L., 529 U.S. at 270, 120 S.Ct. 1375, giving them incentive to be honest.
In this case there was no “known” informant. Giving himself a name does not transform a tipster into a “lcnoum informant whose reputation can be assessed and who can be held responsible if [his] allegations turn out to be fabricated.” J.L., 529 U.S. at 270, 120 S.Ct. 1375 (citation omitted). Self-identification by name alone is meaningless when no information is available to verify whether the self-identification is true or false. The police did not know “Davis,” had never dealt with “Davis” before, and did not even know if “Davis” was a real name. They never looked for the caller, and never received any additional information from or about him. The police thus had no basis on which to assess the caller’s reputation or information, and no way to hold him accountable if his allegations turned out to be fabricated.[1]
In the second instance, if a tip comes from an unknown person, reliability may be based on the fact that the tipster shows inside knowledge of criminal activity by accurately predicting the subject’s behavior, which is then verified by police observation. Simply describing a subject is not enough. As the Court made clear in J.L., requiring either that the informant be known and reliable from past dealings, or that the tipster, if anonymous, provide predictive future behavior, guards against the unwitting misuse of the police power. A vindictive person, or merely a mistaken person, should not be able to effectuate the seizure of another by simply calling the police, describing the object of their malice or their mistake, and conclusorily stating that a crime is being, or going to be, committed by him.
Because “Davis” was not a known informant, the information the police received from him could not justify a Terry stop unless the tip made predictions — not merely descriptions — which could be tested by subsequent police investigation. In discussing Alabama v. White, the Supreme Court in J.L. explained its jurisprudence on this point:
In White, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. Standing alone, the tip would not have justified a Terry stop. Only after police observation showed that the informant had accurately predicted the woman’s movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. Although the Court held that the suspicion in White became reasonable after police surveillance, we regarded the case as borderline. Knowledge about a person’s future movements indicates some familiarity with that person’s affairs, but having such knowledge does not necessarily imply that the informant knows, in par *1297 ticular, whether that person is carrying hidden contraband. We accordingly classified White as a “close case.”
J.L., 529 U.S. at 270-71, 120 S.Ct. 1375 (emphasis added) (internal citations omitted). The Court then took great pains to clarify that the relevant question is not whether the tipster’s description of what he or she is seeing is accurate, but rather whether there are accompanying predictions of future actions which are then found to be accurate through subsequent police surveillance or investigation so as to make the tip reliable. The tip in J.L. “lacked the moderate indicia of reliability present in White and essential to the Court’s decision in that case” because it “provided no predictive information and therefore left the police without means to test the informant’s knowledge or credibility.” J.L., 529 U.S. at 271, 120 S.Ct. 1375. Similarly, in Illinois v. Gates, another tip case, the Court pointed to the fact that “the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.” 462 U.S. 213, 245, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (emphasis added). See also White, 496 U.S. at 332, 110 S.Ct. 2412 (pointing to “independent corroboration by the police of significant aspects of the informer’s predictions [which] imparted some degree of reliability to the other allegations made by the caller”) (emphasis added).
Thus, the “reliability” of the tip does not relate to whether the tip accurately describes a particular person. The relevant inquiry is whether the tip is reliable in its ability to describe criminal activity. As the Court noted in J.L.:
An accurate description of a subject’s readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.
529 U.S. at 272, 120 S.Ct. 1375 (emphasis added).
Nor does it make a difference that the description includes the presence of a firearm. There is no firearm exception to the reliability requirement. When the argument was made in J.L. that a tip alleging an illegal gun should justify a stop and frisk even if the accusation would fail standard pre-search reliability testing, the Supreme Court plainly stated: “We decline to adopt this position.” Id.
Because the tip which formed the basis of the seizure here was not reliable — that is, it did not come from a known informant, nor did it provide predictive information which could be verified by police investigation — it cannot, under J.L., be used to support reasonable suspicion. Both tips came from sources unknown to the police and described a person’s race, location, alleged possession of a firearm and an additional purported identifying characteristic — a plaid shirt in J.L. and a white SUV here. Neither tip demonstrated a “knowledge of concealed criminal activity.” If the tip in J.L. could not support reasonable suspicion, the tip in this case cannot do so either.
The majority attempts to avoid the reach of J.L. by saying that the police relied on more than the anonymous tip. Specifically, the majority says that “the 911 caller’s tip combined with independent police investigation of recent bank robberies provided sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.” First, a continu *1298 ing “investigation” of an unsolved crime has nothing to do with the investigation required by J.L. in order to permit reliance on a tip. The investigation required by J.L. is an investigation of the tip itself. That is, the police must conduct investigation to verify that the predicted suspicious activity relayed in the tip does in fact occur. The fact that the police department had ongoing open investigations of unsolved crimes is irrelevant here. The only things connecting these men to the unsolved crimes were their race and gender, and the fact that they were in a large vehicle. This is surely a common occurrence in West Palm Beach.
Moreover, the fact that the City of West Palm Beach had unsolved bank robberies which were still under investigation adds absolutely nothing to warrant reasonable suspicion that these four black men had anything to do with them. Prior commission of bank robberies in West Palm Beach by black men surely cannot be sufficient to justify the detention of any group of black men in large vehicles at gas stations located near banks. Such a view essentially justifies the immediate seizure of any citizen accurately described by an unknown tipster of indeterminate reliability, so long as that description also happens to match the race and gender of suspects from unsolved crimes. Under this test, “[a]ny-body with enough knowledge about a given person to make her the target of a prank, or to harbor a grudge against her, will certainly be able to formulate a tip” which could result in an improper seizure. See White, 496 U.S. at 333, 110 S.Ct. 2412 (Stevens, J., dissenting).
Nor did the officers observe Lindsey and his companions engage in any suspicious activity. When Sergeant Tierney first saw Lindsey, he was in a white SUV which was simply pulling up to a gas pump from a parked position at a gas station. At this point, Tierney, who was aware that bank robberies had been committed in the city,[2] knew only that an anonymous caller had reported that four black men were loading guns into a white SUV in the parking lot of a Mobil gas station across the street from a Wachovia bank. There had been no description of what these men were wearing nor of any of their physical characteristics beyond that they were black and were in a white SUV. Tierney saw a white SUV pulling out of a parking space in the gas station up to the gas pump and four black males exit the car. While one of the men opened the hood and began looking inside, Lindsey and the other two men walked toward the convenience store. Neither Tierney nor anyone else observed anything suspicious or out of the ordinary in their actions, nor saw any bulges or other indicia that the men were carrying weapons. Nonetheless, without *1299 stopping to ask any questions or waiting to observe any of the men’s actions or behavior, Tierney jumped out of his car with his shotgun drawn, yelling at the men to get down on the ground. At the same time, seven other officers in five or six separate vehicles surrounded the men, likewise yelling at them to get down with their weapons drawn and pointed. Ultimately, eight officers drew their weapons and detained Lindsey and his companions in handcuffs for approximately 45 minutes[3] before “formally”[4] arresting Lindsey and releasing the other three men. This is not the kind of “investigation” contemplated by the Supreme Court in White and Terry. The officers’ actions made clear that the putative Terry stop was not designed to quickly confirm their suspicions of Lindsey’s dangerousness. To the contrary, the officers had already reached that conclusion based merely on the anonymous and completely unreliable tip.
In this case, neither the tip nor the fact that there were open investigations of bank robberies provided reasonable suspicion sufficient to justify any seizure. It is certainly possible that if the officers had investigated the tip further, they might have personally observed suspicious behavior giving rise to the reasonable suspicion needed for a Terry stop, which might then have led to the probable cause needed for an arrest. They did not, however, and we cannot retroactively find reasonable suspicion where none existed.
For the foregoing reasons, I respectfully dissent.

. Indeed, in this case, the tipster’s information was false. No "guns” appear to have been loaded into this SUV — the only gun found was a handgun in the console, which provided the basis of the charges against Lindsey.

. Sergeant Tierney, the first officer on the scene, testified that he was concerned about the possibility of weapons "where the caller had indicated that they were loading weapons in the car,” and "[t]he proximity to the bank and with the history we had had as far as the bank takeovers." Tierney did not testify as to the details of any of these bank robberies, and there is no evidence in the record that he knew anything about the robberies — including even the race and gender of the robbers— other than that they had occurred.
Detective Jason Houston, who arrived on the scene at least ten minutes after Sergeant Tierney had detained the four men at gunpoint, testified that there had been four bank robberies in West Palm Beach between October and December of 2003, though none had occurred between December and February 2004, the date of Lindsey’s arrest. The bank robberies were conducted by three or four black men who would enter the bank masked and armed with long guns. Although, "larger” vehicles were used, no white SUV was ever described as being used in one of these robberies. In addition, Houston testified that a Wachovia customer was robbed in the parking lot of the bank by two black men using a handgun in September 2003.

. It appears from the record that Sergeant Tierney drew his weapon and forced the men to the ground at approximately 10:40 a.m., and that the other three men were released at approximately 11:30, so his detention lasted in the range of 45 minutes to one hour.

. The Supreme Court told us quite clearly in Terry that we must determine "whether [the] search and seizure of petitioner were reasonable, both at their inception and as conducted." 329 U.S. at 27-28, 67 S.Ct. 13. The manner in which this seizure was effectuated — where seven or eight officers brandishing guns forced Lindsey and his companions to prostrate themselves on the ground and immediately handcuffed them, despite the fact that none of the officers had observed any suspicious behavior or possible weapons — exceeded the bounds of Terry and constituted an arrest requiring probable cause. A Terry stop "cannot continue for an excessive period of time ... or resemble a traditional arrest.” Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (citations omitted); see also Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.”).