## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 02 2016, 8:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Edgar
J. Edgar Law Offices, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

I.C. and Z.S., minor children,
and
C.S., Mother

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

December 2, 2016

Court of Appeals Case No.
49A02-1604-JT-907

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Larry E. Bradley, Magistrate

Trial Court Cause No.
49D09-1506-JT-416
49D09-1506-JT-417

**Mathias, Judge.**

[1] The Marion Superior Court terminated C.S.'s ("Mother") parental rights to her two minor children. C.S. appeals and raises two issues.

I. Whether the Department of Child Services ("DCS") proved that there is a reasonable probability that continuation of the parent-child relationship posed a threat to I.C.'s well-being; and,

II. Whether C.S. was compelled to testify that she smoked marijuana, which violated her privilege against self-incrimination, and therefore, was denied her right to a fair trial.

[2] We affirm.

## Facts and Procedural History

[3] In June 2012, Mother gave birth to I.C. Shortly after his birth, Mother was hospitalized for an infection for approximately three weeks. While Mother was in the hospital, I.C.'s father and maternal grandmother cared for him. During Mother's hospitalization, a relative took one-month-old I.C. to the hospital and he was diagnosed with an open wound on his neck, rib fractures, broken collar bone, and a spinal column fracture.

[4] I.C. was adjudicated a child in need of services ("CHINS") on August 14, 2012. I.C. was placed in a foster home and Mother was ordered to participate in services including parenting and domestic violence classes, and therapy. Mother complied with services and participated in supervised visitation.

[5] On July 19, 2014, I.C. was returned to Mother's care for a trial home visit. On this date, Mother was also pregnant with her second child. Z.S. was born on August 10, 2014.[1] Z.S. weighed under five pounds at birth.

[6] Shortly after Z.S.'s birth, DCS removed both children from Mother's care. Z.S. was adjudicated a CHINS after Mother admitted that she was unable to properly care for him and meet his special medical needs. Z.S. suffers from severe persistent asthma, gross motor developmental delay, and low muscle tone. Doctors describe him as medically fragile. Numerous environmental triggers, including smoke and secondhand smoke, can exacerbate Z.S.'s asthma to the point where he requires hospitalization. I.C. also suffers from asthma, but his condition is not as severe. Mother is a smoker and has been unable to quit smoking for any significant length of time.

[7] The DCS case worker who removed the children from Mother's home in August 2014 observed safety concerns and a lack of edible food in the home. Mother was also not properly caring for the children and relied on physical discipline. Mother was ordered to continue to participate in reunification services.

[8] After I.C. was removed from Mother's care for the second time, he began to experience separation anxiety and feared being separated from anyone. When

---

[1] The children have different biological fathers, and the fathers' parental rights are not at issue in this appeal. I.C.'s father's parental rights were terminated in October 2015. Mother does not know the full name of Z.S.'s father.

I.C. feels anxious, he makes himself vomit. I.C. participates in therapy. His therapist believes he is bonded to his foster parents and any change in his placement could cause negative long-term effects. His therapist strongly believes that a permanent home is important for I.C. because of the instability in his young life and attachment concerns.

[9]　Mother participated in services including supervised visitation. However, visitation never progressed beyond supervised. Mother was taught how to clean her home to remove the smell of smoke and given tools to help her quit smoking. Mother has not been able to quit smoking and admits that she smokes when she feels stressed. Service providers smelled smoke in Mother's home on occasion, though not every time they visited.

[10]　Mother participated in therapy but missed the last three sessions in the weeks leading up to the termination hearing. She was also informed of, but failed to attend, a majority of the children's medical appointments. The guardian ad litem expressed concern that Mother does not understand the children's medical needs and that she continues to smoke despite the negative effects on her children's health, particularly Z.S.

[11]　The service providers agreed that Mother has had sufficient time and services to address the issues that led to the children's removal. On the date of the termination hearing, nearly four-year-old I.C. was in Mother's care for only two months since his birth. After his second removal in September 2014, Mother's visitation was continually supervised.

The DCS filed a petition to terminate Mother's parental rights to I.C. and Z.S. on June 2, 2015, and a hearing was held on the petition on March 21, 2016. The trial court issued its order terminating Mother's parental rights to both children on April 11, 2016. The trial court found and concluded that

15. [Mother] receives monthly disability income of seven hundred and fifty-three dollars for cognitive deficiencies. She also receives food stamps.

16. [Mother] has maintained an apartment for three years. She has trouble maintaining her utilities. [Mother] estimates her rent and utilities to be around six hundred and seventy-five dollars per month.

17. [Mother] exercises eight hours of parenting time with the children. [I.C. and Z.S.] demonstrate a bond with their mother. [Mother] is appropriate, affectionate and engaging during parenting time.

18. During the time the CHINS cases have been pending, [Mother] has completed parenting classes, a domestic violence class, and had completed most of her home based case management and therapy.

19. [Mother] has not made herself available for her last three therapy sessions. Four weeks ago, the therapist smelled cigarette smoke in [Mother's] apartment.

20. [Z.S. and I.C.] have resided together in the same foster home since their respective placements in August 2014 and September 2014. This placement is pre-adoptive.

21. [I.C.] has special needs which include reactive airwaves disease, and receives therapy for delays in his speech. He also sees a therapist and doctor for an anxiety disorder.

22. [I.C.'s] therapist, Malinda Cox, sees [I.C.] as also having Reactive Attachment Disorder which could come from being in several placements during his long standing CHINS case. She believes he could be affected negatively if moved again causing more anxiety. Ms. Cox also believes that [I.C.] needs a permanent home that is stable and routine to avoid long term negative effects.

23. [I.C.] has been out of his mother's care all of his life with the exception of a couple of months in 2014.

24. [Z.S.] has been out of his mother's care all of his life with the exception of approximately one week.

25. [Z.S.] has special needs which include severe asthma, a swallowing issue, low tone muscles, and developmental issues.

26. [Z.S.] takes daily medicine for his asthma. He also uses a nebulizer as needed. He has been hospitalized four times in 2015 with breathing complications. The hospitalizations occurred after parenting time.

27. Cigarette smoke, strong odors and fragrances, animals, pollution, indoor mold, and cold weather can all be triggers for the children's breathing problems.

\*\*\*

33. [Mother's] plan, other than not to smoke, is to go outside and to do it. After all this time, [Mother] still does not seem to grasp

the utmost importance of keeping her children, especially [Z.S.], from any contact with cigarette smoke.

34. [Mother] has attended some of her children's medical appointments. She was provided with the appointment dates. She does not have a full awareness of all the children's medical issues.

35. On June 2, 2015, the CHINS Court changed the children's plan for permanency from reunification to adoption. At that time the Court found, in part, that the cases had been open since July 2012 and August 2014, and no service provider had recommended that the children be placed into the care of their mother, that smoking continued to be an issue, and that [I.C.'s] therapist stressed that he had been in "limbo" for about three years and needed permanency.

***

37. Continuation of the parent-child relationship poses a threat to the children's well-being. The children have been placed out of the home for a considerable amount of time with no service provider recommending unsupervised visitation at this point. The children need and deserve a permanent home where their health is not endangered. If placed in the home with their mother, the threat to well-being could be life threatening, especially to [Z.S.] if around smoke, even on clothes and furniture. Upon observing [Mother] during the trial and listening to her testimony, the Court has grave concerns that the children would not continue with their myriad of medical and services appointments due to scheduling and transportation, and the possible stress it would cause [Mother] when trying to meet her children's special needs.

Appellant's App. pp. 31-32. The trial court also concluded that termination was in the children's best interests and the foster home is pre-adoptive.

[13] Mother now appeals the termination of her parental rights to I.C. and argues that she was denied a fair trial. Additional facts will be provided as necessary.

## Standard of Review

[14] In the appellate review of a termination of parental relationship, the following standard applies:

> We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment.

*In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quotations and citations omitted). "In the appellate review of claims alleging a lack of proof by clear and convincing evidence, the reviewing court must [] determine whether there is probative evidence from which a reasonable fact-finder could have found the challenged matters proven by clear and convincing evidence." *In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016).

## I. Whether Continuation of the Parent-Child Relationship Poses a Threat to I.C.'s Well-Being

[15] The traditional right of parents to establish a home and raise their children is protected by the United States Constitution, but may be terminated when

parents are unable or unwilling to meet their parental responsibilities. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). When the DCS seeks to terminate the parent-child relationship of a child that has been adjudicated as a CHINS, its petition must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(A)-(D). If the trial court finds that each of these allegations "are true," it must "terminate the parent-child relationship." Ind. Code § 31-35-2-8(a). The trial court must enter findings of fact that support its conclusions. Ind. Code § 31-35-2-8(c). "[A] finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence." Ind. Code § 31-34-12-2.

[16]   Importantly, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id*.

[17]   Mother argues that the DCS failed to prove that there was a reasonable probability that continuation of the parent-child relationship poses a threat to

I.C.'s well-being because "there is no medical testimony in the record that would indicate that [her] use of cigarettes endangered I.C.'s health." Appellant's Br. at 13. We agree that Mother's smoking habit poses a much greater threat to Z.S., who is medically fragile, than to I.C. However, I.C. does suffer from asthma, and we may logically conclude that residing in a home with Mother, who smokes, would negatively impact his health.

[18] Also, the trial court did not limit its conclusion of law concerning the threat to I.C.'s well-being to Mother's smoking habit. Specifically, the court concluded that:

> The children have been placed out of the home for a considerable amount of time with no service provider recommending unsupervised visitation at this point. The children need and deserve a permanent home where their health is not endangered. If placed in the home with their mother, the threat to well-being could be life threatening, especially to [Z.S.] if around smoke, even on clothes and furniture. Upon observing [Mother] during the trial and listening to her testimony, the Court has grave concerns that the children would not continue with their myriad of medical and services appointments due to scheduling and transportation, and the possible stress it would cause [Mother] when trying to meet her children's special needs.

Appellant's App. p. 32.

[19] I.C., who was nearly four years old on the date of the hearing, has only been placed in Mother's care for two months of his young life. As a result of his placement in multiple foster homes, and his brief, temporary stay with Mother, I.C. suffers from separation anxiety and reactive attachment disorder. I.C.'s

therapist emphasized that I.C. needs a stable, permanent home and another move could have a long-term negative effect on him.

Mother has demonstrated that she is able to care for I.C. for short, supervised periods of time. However, her visits have remained supervised because Mother has not shown that she was capable of progressing beyond supervised visitation. Moreover, the evidence supports the trial court's finding that Mother does not fully comprehend I.C.'s medical issues, and that Mother would be unable to continue to maintain I.C.'s medical and service appointments.

For all of these reasons, we conclude that the DCS presented clear and convincing evidence that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to I.C.'s well-being.

## II. Self-Incrimination

The Fifth Amendment's Self-incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection extends to state cases by virtue of the Fourteenth Amendment. *See Withrow v. Williams*, 507 U.S. 680, 688-89 (1993). "[T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial . . . but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (citation omitted); *see also Clifft v. Ind. Dep't. of State Revenue*, 660 N.E.2d 310, 314 (Ind. 1995).

[23] However, "[t]he Fifth Amendment prohibits only compelled testimony that is incriminating." *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 190 (2004). If those two elements are present,

> a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. Absent such protection, if he is nevertheless compelled to answer his answers are inadmissible against him in a later criminal prosecution.

*Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973).

[24] Here, Mother was compelled to admit that she smoked marijuana over her objection that she had the right not to incriminate herself. Tr. pp. 66-67. Mother argues that the trial court "placed [her] in the precarious position of choosing to admit to smoking marijuana and expose herself to criminal prosecution or to refuse to answer, expose herself to contempt sanctions, and lose credibility with the court." Appellant's Br. at 17. Further, she claims that her "compelled admission of her use of marijuana was so prejudicial that it denied her a fair trial." *Id*. at 19.

[25] We cannot agree. Mother testified that she used marijuana in the past (without a prescription) because she has vision problems. No testimony or other allegations indicated that she is a current marijuana user. The testimony was limited, and the DCS did not make any reference to the admission in its closing argument. Importantly, the trial court did not make any reference to Mother's statement that she previously used marijuana in its order terminating her

parental rights. On the record before us, we cannot conclude that Mother's compelled testimony that she smoked marijuana was considered by the trial court when it determined that Mother's parental rights to I.C. and Z.S. should be terminated. Therefore, Mother has not established that she was denied a fair trial.

## Conclusion

We affirm the trial court's order terminating Mother's parental rights to I.C. and also conclude that Mother was not denied a fair trial.

Affirmed.

Robb, J., and Brown, J., concur.