

FILED

Feb 13 2018, 7:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James C. Spencer
Dattilo Law Office
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Vaughn Whitt,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 13, 2018<br><br>Court of Appeals Case No.<br>39A01-1612-CR-2921<br><br>Appeal from the Jefferson Circuit Court<br><br>The Honorable Darrell M. Auxier, Judge<br><br>Trial Court Cause No.<br>39C01-1504-MR-366 |

**Vaidik, Chief Judge.**

## Case Summary

[1] Vaughn Whitt, a thirty-two-year-old man, brought a gun to a fight between two groups of high schoolers, threatened to use the gun multiple times, and then

fired the gun, killing one of the teenagers. He then fled the scene, crossing a bridge over the Ohio River into Kentucky. Indiana officers pursued Whitt into Kentucky and arrested him there. He was convicted of numerous offenses, including murder. He now appeals, arguing that the trial court erred in admitting evidence stemming from the stop in Kentucky and that the evidence is insufficient to support his murder conviction. Finding no error in the admission of evidence and that the evidence is sufficient to support Whitt's murder conviction, we affirm.

## Facts and Procedural History

[2] Madison, Indiana, is located on the Ohio River in Jefferson County, Indiana. Milton, Kentucky, is located across the river from Madison. The two towns are connected by the Milton-Madison Bridge. The Milton-Madison Bridge is the only bridge in Jefferson County that connects Indiana and Kentucky. Tr. Vol. II p. 20. The nearest bridges connecting the two states are either thirty miles to the east (Switzerland County, Indiana) or forty-five miles to the west (Louisville, Kentucky). *Id.*

[3] On April 15, 2015, Cole Wright, a sixteen-year-old from Milton, and Tyler Williams, a seventeen-year-old from Madison, exchanged Facebook messages about having a fight. The fight, which was over Tyler's girlfriend, was planned for the next day at a farm in Milton.

[4] Each boy recruited friends to attend the fight for support. Among others, Cole asked Bradey McCane to come. Bradey heard at school that weapons would be involved, so after school on April 16—the day of the fight—he went to a friend's house, where he obtained a gun and brass knuckles. Bradey and some of his friends then went to the home of Whitt, who went by the nickname "Tex." Bradey asked Whitt to go to the fight as backup and showed him the gun. Whitt took the gun from Bradey. While at Whitt's house, Whitt and the boys smoked marijuana and drank beer. Eventually, the group left Whitt's house for the farm; Bradey drove Whitt and two of the boys in his mother's car, a Hyundai Santa Fe. Whitt continued drinking beer on the way to the farm. Bradey had the brass knuckles, Whitt had the gun, and the other two boys had a metal pipe and a baseball bat.

[5] About 10-15 Madison teenagers and 10-15 Milton teenagers attended the fight. When the Madison teenagers arrived, Whitt waved the gun in the air and exclaimed, "if any of you jump in you're not going home to your beds tonight." Tr. Vol. IV p. 112. Some of the Madison teenagers returned to their cars when they saw the gun. Whitt then set the ground rules for the fight, including putting away cell phones, not recording the fight, and no jumping in the fight. Whitt's behavior was "controlling, mean, [and] aggressive," and "everything had to go his way or he was going to make sure it did if [they] didn't want it to or let it." *Id.* at 66. When some of the Milton teenagers told Whitt to put away the gun, Whitt complied and put the gun on the passenger seat of the Santa Fe; however, Whitt said that he would use it if he had to. *Id.* at 99.

[6] Cole and Tyler then fought. Against Whitt's orders, part of the fight was recorded. *See* State's Ex. 41 (video). During the fight, there was a lot of "trash talk" and cussing. Tr. Vol. III p. 27. The fight ended when a neighbor came out with a phone in his hand, triggering a concern that the police would be called. The teenagers returned to their respective cars and left the farm, with the Madison teenagers heading to Crystal Beach in Madison and some of the Milton teenagers heading to Whitt's house. But before leaving, Whitt and Bradey argued with some of the Madison teenagers, mainly Brandon Gatke, threatening to "whoop his a**." Tr. Vol. V pp. 149-50.

[7] When Whitt, Bradey, and the other Milton teenagers arrived at Whitt's house, they smoked marijuana, and Whitt drank more beer. Soon after their arrival, one of the boys received a video of the fight on Facebook. When Whitt saw the video, he started "yelling and screaming" that he was going to go to Indiana to "whoop some a**" and get the video off Facebook. *Id.* at 198. Apparently, Whitt was concerned that he would get in trouble with his wife. Whitt and the boys were "pumped," and some of them—Whitt, Bradey, and Lucian Emery— decided to head to Crystal Beach. Tr. Vol. III p. 58. They left about twenty minutes after arriving at Whitt's house. As they left, Whitt announced that if someone tried to hurt them, "he wouldn't think twice, that he'[d] kill them." *Id.* at 59. Bradey drove his mother's Santa Fe with Whitt in the front passenger seat and Lucian in the backseat. Whitt continued drinking beer on the way to Crystal Beach. Whitt had the brass knuckles in his pocket, the metal pipe was

on the floorboard in the backseat, and the gun was in the glove box. As Bradey approached Crystal Beach, Whitt removed the gun from the glove box.

[8] There were about 15-20 Madison teenagers at Crystal Beach when Bradey "came in pretty hot . . . and parked." Tr. Vol. II p. 226. The Madison teenagers had discussed the possibility of the Milton teenagers coming over for a rematch and approached the Santa Fe. Whitt exited the Santa Fe and told them to take "the fu**ing videos off-line." Tr. Vol. VI p. 226. Whitt, who acted like he was "on something," Tr. Vol. III p. 100, was "really angry," "furious," "aggravated," "aggressive," "uncoordinated," and "drunk." *Id.* at 105, 127, 237; Tr. Vol. IV p. 124; Tr. Vol. V p. 21. He demanded the Madison teenagers' phones because, according to him, the video was going "viral" and he needed to put a stop to it. Tr. Vol. III p. 127. Whitt pulled the clip out of the gun to show everyone it was loaded, waved the gun around, and told the Madison teenagers that he was going to put them "all in a box" and that they "wouldn't be going home tonight." Tr. Vol. IV p. 34. He then asked, "Which one of you [is] going to die first?" *Id.* at 85. He put the gun into the faces of several of the Madison teenagers, touching the gun to their cheeks. He told one of the teenagers that "he'd fu**ing kill him" and that he has "been to prison and [is] not afraid to go back." Tr. Vol. III pp. 101, 104.

[9] Whitt threatened and yelled for about ten minutes. Eventually Bradey was able to take the gun away from him and put it in the glove box of the Santa Fe. Tr. Vol. V pp. 157-58, 212. After the gun was put away, Whitt and Brandon

started "getting into it."[1] *Id.* Bradey stepped in between them and pushed Brandon. Brandon told Bradey not to push him again. Tr. Vol. III p. 213. When Bradey pushed him again, Brandon "haul[ed] back and hit[]" Bradey. Tr. Vol. IV p. 128. Bradey fell to the ground. According to Bradey, his "bell [was] rung." Tr. Vol. V p. 214. Brandon got on top of Bradey and continued hitting him. Tr. Vol. IV. p. 128. Whitt went to the Santa Fe and retrieved the gun. Tr. Vol. VI pp. 231, 243; Ex. 129, pp. 20-21 (transcript of Whitt's April 19, 2015 interview with police). Up until this point, Brandon and Bradey were the only two fighting, but then Whitt appeared with the gun and "started pistol whipping . . . Brandon" on the head. Tr. Vol. IV p. 129; Ex. 33.[2] Brandon responded by saying, "I got hit in the head." Tr. Vol. III p. 106. At this point, several of Brandon's friends came to his aid. Three boys approached Whitt— Skyler Hoffman grabbed Whitt's shirt and tried to pull him back, Taylor Kelly hit Whitt from the front, and seventeen-year-old Brennan Stewart started punching the back of Whitt's head. In response to Brennan punching the back of his head, according to Skyler, Whitt "turned," "pointed" the gun at Brennan, and "deliberately shot" him. Tr. Vol. IV p. 132. After Whitt shot Brennan, he

---

[1] Various portions of what happened next were recorded by one of the Madison teenagers in four short video segments. The segments are not continuous. These video files were sent to the FBI, enhanced for clarity, and admitted into evidence at trial as Exhibit 33. Tr. Vol. III pp. 136-37, 186-88.

[2] Whitt and the State disagree how many times Whitt struck Brandon on the head with the gun. Whitt says he hit Brandon only once, while the State says Whitt hit him three times. As support, Whitt claims that the video, Exhibit 33, "unquestionably shows" Whitt hitting him "only" once. Appellant's Reply Br. p. 14. We have reviewed the video multiple times. While the video shows Whitt hitting Brandon once on the head with the gun, it cannot be determined if Whitt hits him again because other people stepped in and obstructed the camera person's viewpoint (in fact, the actual shooting can only be heard and not seen). In any event, we find that the number of strikes is irrelevant to the issues Whitt raises on appeal.

waved the gun around and pointed it at some of the other teenagers. Tr. Vol. III p. 107; Tr. Vol. IV p. 134. Whitt then got into the Santa Fe, and Bradey, Whitt, and Lucian sped off toward Kentucky. Whitt told Bradey and Lucian that if they "snitched," he would kill them and their families. Tr. Vol. V p. 221.

[10] After Skyler heard the gun shot, he ran. He did not know that Brennan had been hit until he heard Brennan screaming. He immediately ran back to Brennan, who had been shot in the abdomen, and called 911. The time of the call was 8:55:55 p.m. Suppression Ex. 39. Brennan was taken to the hospital, where he died.

[11] Meanwhile, Madison Police Department Officer Kyle Cutshaw and Detective Jonathon Simpson were in the area when they received a dispatch about a shooting that had "just" occurred at Crystal Beach, which is located adjacent to the Ohio River on Vaughn Drive. Suppression Ex. 41. Officer Cutshaw was driving a marked patrol car, and Detective Simpson was the passenger. Dispatch relayed that the shooter—a white male in his 40s who went by the nickname "Tex" and had tattoos on one of his arms—was leaving the area in a "gray" SUV and heading toward Kentucky. *See id.* (911 dispatcher explaining that the "best" description he could get was a "gray" SUV). As Officer Cutshaw turned onto Vaughn Drive, Detective Simpson observed a dark-colored SUV "accelerating" across the Milton-Madison Bridge. Tr. Vol. II p. 16; Tr. Vol. VI p. 22. The SUV was about one mile from Crystal Beach. Tr. Vol. II p. 17. It was the only car on the bridge at the time. *Id.* By the time Officer Cutshaw drove onto the bridge, Detective Simpson saw two cars on the

bridge. Officer Cutshaw activated his emergency lights and passed both of them, neither of which was the dark-colored SUV they had been pursuing. Once the officers got to the end of the bridge and into Kentucky, they did not see the SUV. But as they navigated the curve in the road, they saw it. They caught up to the SUV and pulled it over, approximately two miles from Crystal Beach. The SUV was a green Hyundai Santa Fe. The time was 9:00 p.m. exactly—approximately four minutes after 911 was called. Tr. Vol. II p. 178; Suppression Ex. 39. As Bradey started to pull over, Whitt kept saying, "Go, Bradey, go," and told him that "his freedom was more important" and that he would do "what he had to [in order] to keep his freedom." Tr. Vol. V p. 128. Just before Bradey stopped the Santa Fe, Whitt threw the gun out the window. Tr. Vol. VI. p. 239; Tr. Vol. VII p. 30. Once Bradey put the Santa Fe in park, Whitt tried putting it back in gear.

[12] Officer Cutshaw approached the driver side of the Santa Fe and Detective Simpson approached the passenger side. Detective Simpson asked the front-seat passenger, who matched the description of the shooter and who was wearing a "Texas" hat, where they were coming from, and Whitt responded "from the trailer park on [Highway] 36." Tr. Vol. VI p. 27. Detective Simpson knew this was not true, as Highway 36 is on the Kentucky side of the river and he had seen the Santa Fe crossing the bridge from Indiana into Kentucky. Detective Simpson removed Whitt from the Santa Fe, patted him down, and placed him in handcuffs. During the pat down, Detective Simpson found brass knuckles in Whitt's pocket.

[13] About fifteen minutes after the Indiana officers initiated the stop, Kentucky State Troopers arrived on the scene to assist them.[3] Detective Simpson accompanied a Kentucky officer to obtain a Kentucky search warrant for the Santa Fe. The Santa Fe was then searched pursuant to the warrant, but no gun was found. Detective Simpson then began searching for the gun along the side of the road. He located the gun in the grass, approximately fifteen feet away from where the Santa Fe had been stopped. The next day, Indiana officers returned to the area and found the magazine to the gun approximately thirty-four feet away from where the gun had been found.

[14] The State ultimately charged Whitt with murder, a firearm enhancement, two counts of Level 5 felony intimidation, six counts of Level 6 felony pointing a firearm, and Class A misdemeanor carrying a handgun without a license. Before trial, Whitt filed a motion to suppress the evidence obtained from the searches and seizures in Kentucky because the "Madison Police were without jurisdiction to make a traffic stop in Kentucky." Appellant's App. Vol. VII p. 39. Following a hearing, the trial court denied Whitt's motion, concluding that "The pursuit of the Defendant by Madison Police Department officers constituted a fresh pursuit" according to the common law of Kentucky and therefore the stop of Whitt was lawful. *See* Appellant's App. Vol. VIII pp. 2-3.

---

[3] The Kentucky State Police were notified at 9:00 p.m. Suppression Ex. 39.

[15] A jury trial was held October 17-26, 2016. Whitt testified in his own defense at trial that he tripped backwards over the curb and the gun went off when somebody hit his arm. Tr. Vol. VI p. 235. As lesser-included offenses to murder, the jury was instructed on both Level 5 felony reckless homicide and Level 2 felony voluntary manslaughter.[4] Appellant's App. Vol. IX pp. 39-40. The jury found Whitt guilty of murder, two counts of Level 5 felony intimidation, four counts of Level 6 felony pointing a firearm, and Class A misdemeanor carrying a handgun without a license. The jury found him not guilty of two counts of Level 6 felony pointing a firearm. Whitt then admitted that the firearm enhancement applied to the offense of murder. The trial court sentenced Whitt to fifty-five years for murder enhanced by ten years for the use of a firearm. The court ordered the remainder of the sentences to be served concurrently.

[16] Whitt now appeals.

# Discussion and Decision

[17] Whitt raises two issues on appeal: whether the trial court erred in admitting evidence stemming from the stop in Kentucky and whether the evidence is sufficient to support his conviction for murder.

---

[4] The jury was specifically instructed that the doctrine of self-defense did not apply. Appellant's App. Vol. X p. 10. Whit does not challenge that instruction on appeal.

# I. Admission of Evidence

[18] Whitt first contends that the Indiana officers did not have authority to stop him in Kentucky, that for this reason the stop violated the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution, and that the trial court therefore erred in admitting evidence stemming from the stop.

## A. Fourth Amendment

[19] Whitt argues that the stop violated the Fourth Amendment, which "protects 'against unreasonable searches and seizures' of (among other things) the person." *Virginia v. Moore*, 553 U.S. 164, 168 (2008). His argument starts from the premise that the stop violated the Fourth Amendment if it violated Kentucky law. He then asserts that a Kentucky stop by an Indiana officer violates Kentucky law unless the Indiana officer entered Kentucky in "fresh pursuit" and that the Indiana officers in this case did not enter Kentucky in "fresh pursuit."[5] But we need not address this argument because Whitt's starting premise is faulty.

---

[5] Under the common-law doctrine of fresh pursuit, an officer may pursue a felon or a suspected felon, with or without a warrant, into another jurisdiction and arrest the suspect there. *See* 5 Am. Jur. 2d *Arrest* § 52 (2007). Indiana has adopted the Uniform Act on Fresh Pursuit, which Kentucky has not. *See* Ind. Code § 35-33-3-1 (stating that a police officer of another state who enters Indiana in "fresh pursuit" and continues in "fresh pursuit" in order to arrest a person who is believed to have committed a felony in the other state has the authority to arrest and hold the person in custody). Accordingly, the trial court resorted to the common law as the source of Kentucky law.

The United States Supreme Court has made clear that a violation of state law is generally irrelevant to the question of whether a search or seizure is reasonable under the Fourth Amendment: "[W]hether or not a search is reasonable within the meaning of the Fourth Amendment . . . has never depend[ed] on the law of the particular State in which the search occurs." *Id.* at 172 (quotation omitted). This is because while individual states may construe their own constitutions as imposing more stringent constraints on police conduct than does the federal constitution, state law cannot "alter the content of the Fourth Amendment." *Id.* For example, in *Whren v. United States*, 517 U.S. 806 (1996), the United States Supreme Court held that police officers acted reasonably in stopping a car even though they violated regulations limiting the authority of plainclothes officers in unmarked vehicles. The Court

> thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule. While those practices "vary from place to place and from time to time," Fourth Amendment protections are not "so variable" and cannot "be made to turn upon such trivialities."

*Moore*, 553 U.S. at 172 (quoting *Whren*, 517 U.S. at 815).[6] In other words, incorporating state-law limitations into the federal constitution would produce an unpredictable constitutional regime that would be "only as easy to apply as the underlying state law, and state law can be complicated indeed." *Id.* at 175.

---

[6] For this reason, Whitt's reliance on the Madison Police Department's policy that "if no Kentucky State Police Troopers join in the pursuit into Kentucky, then the officers are supposed to terminate the pursuit," Appellant's Br. p. 16 (citation omitted), is misplaced.

Accordingly, while states are free to regulate searches and seizures however they desire, state restrictions do not alter the Fourth Amendment's protections. *Id.* at 176; *see United States v. Goings*, 573 F.3d 1141, 1143 (11th Cir. 2009) (holding that it was "irrelevant for purposes of the Fourth Amendment" whether Georgia officers violated Florida law when they pursued the defendant across the Florida-Georgia line and arrested him in Florida, "so long as [the arrest] was supported by probable cause"*); see also United States v. Castetter*, 865 F.3d 977, 978 (7th Cir. 2017) ("[T]he Fourth Amendment does not concern state borders."), *pet. for cert. filed*.

[21] We thus turn to well-established Fourth Amendment law to evaluate the stop in this case. In *Terry v. Ohio,* 392 U.S. 1, 30 (1968), the United States Supreme Court held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when, based on a totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. A *Terry* stop is a lesser intrusion on the person than an arrest and may include a request to see identification and inquiry necessary to confirm or dispel the officer's suspicions. *Hardister v. State,* 849 N.E.2d 563, 570 (Ind. 2006) (citing *Hiibel v. Sixth Judicial Dist. Court of Nev.,* 542 U.S. 177, 185-89 (2004)). Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an unparticularized suspicion or hunch but less than the level of suspicion required for probable cause. *Wilson v. State,* 670 N.E.2d 27, 29 (Ind. Ct. App. 1996) (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). In addition, a traffic

violation is not a condition precedent to a stop otherwise supported by the facts. *State v. Campbell*, 905 N.E.2d 51, 55 (Ind. Ct. App. 2009), *trans. denied*. In other words, an officer may make a *Terry* stop of a vehicle to investigate an offense other than a traffic violation, as long as the officer has reasonable, articulable suspicion that a crime is being or has been committed. *Id.*

[22] Here, Skyler called 911 at 8:55:55 p.m. to report that Brennan had been shot. The 911 dispatcher relayed that a shooting had "just" occurred at Crystal Beach and that the shooter was heading to Kentucky. The dispatcher explained that the best vehicle description he could get was a "gray" SUV. Officer Cutshaw and Detective Simpson were in the area when they heard the dispatch. As they turned onto Vaughn Drive, Detective Simpson observed a dark-colored SUV "accelerating" across the Milton-Madison Bridge, the only bridge to Kentucky in the area. The SUV was the only car on the bridge at the time. Officer Cutshaw made his way to the bridge and activated his emergency lights. Once the officers got to the end of the bridge and into Kentucky, they did not see the SUV. But as they rounded the curve in the road, they saw the same SUV that they had just seen crossing the bridge. They caught up to the SUV and pulled it over, approximately two miles from Crystal Beach. Although the SUV (a Hyundai Santa Fe) was green, Detective Simpson said it had a "grayish" tint to it.[7] Tr. Vol. VI p. 35. The time was 9:00 p.m. on the dot, only four minutes

---

[7] We have looked at pictures of the Santa Fe, *see*, *e.g.*, Ex. 108, and can see why someone would describe it as "grayish."

after 911 was called. Under the totality of the circumstances—including that the shooter was reported to be heading to Kentucky in a gray SUV; the only bridge to Kentucky in the area was the Milton-Madison Bridge; and the short amount of time that had passed between the shooting, when the officers first spotted a dark-colored SUV crossing the Milton-Madison Bridge, and when the officers stopped the Santa Fe—we conclude that the officers had reasonable suspicion to stop the Santa Fe to investigate whether the shooter was inside.

## B. Article 1, Section 11

[23] Although the language of Article 1, Section 11 tracks the language of the Fourth Amendment verbatim, we use a different method of analysis. That is, the legality of a search or seizure under the Indiana Constitution requires an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). In evaluating reasonableness, we consider three factors: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law-enforcement needs. *Watkins v. State*, 85 N.E.3d 597, 601 (Ind. 2017).

[24] The officers' degree of concern, suspicion, or knowledge that a violation had occurred was high. The officers knew that a shooting had just occurred at Crystal Beach and that the shooter was heading to Kentucky in a "gray" SUV. Within minutes, the officers spotted a dark-colored SUV accelerating across the only bridge in the area to Kentucky. The SUV was a mere mile from the

shooting scene and was the only car on the bridge at the time. The officers made their way to the bridge and passed two cars, neither one of which was the SUV. The officers ultimately stopped the SUV in Kentucky, two miles from Crystal Beach. The initial intrusion, a *Terry* stop, was relatively minor. Whitt was later arrested once Detective Simpson confirmed that he matched the description of the shooter. Nevertheless, Whitt argues that the intrusion was "significant" because a "Kentucky resident [was] stopped in Kentucky by out-of-state law enforcement." Appellant's Br. p. 20. However, Whitt has not identified how the intrusion was any greater than if Kentucky officers had stopped him. Finally, Whitt concedes that the third factor, the extent of law-enforcement needs, weighs in "favor of the police['s] ability to investigate a shooting where the victim dies." *Id.* Thus, under the totality of the circumstances, we find that the officers' conduct was reasonable and that the stop did not violate Article 1, Section 11. Accordingly, the trial court properly admitted evidence stemming from the stop.

## II. Sufficiency of the Evidence

[25]  Whitt next contends that the evidence is insufficient to support his murder conviction. A person who knowingly or intentionally kills another human being commits murder, a felony. Ind. Code § 35-42-1-1; Appellant's App. VI p. 4.

[26]  Whitt first argues that the State failed to prove beyond a reasonable doubt that the killing was knowing or intentional and therefore he should have been

convicted of only reckless homicide. *See* Ind. Code § 35-42-1-5 ("A person who recklessly kills another human being commits reckless homicide, a Level 5 felony."). Whitt concedes that there is evidence to support a knowing or intentional killing: Skyler's testimony. However, he argues that Skyler's testimony is "incredibly dubious" and that if Skyler's testimony is discounted, there is insufficient evidence to support his murder conviction.

[27] Under the incredible dubiosity rule, "a court will impinge on the jury's responsibility to judge the credibility of the witnesses only when it has confronted 'inherently improbable' testimony or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'" *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015). A court will only impinge upon the jury's duty to judge witness credibility "where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt." *Id.* (formatting altered). As such, the rule requires that the following three conditions be satisfied: (1) a sole testifying witness; (2) testimony that is inherently contradictory, equivocal, or the result of coercion; and (3) a complete absence of circumstantial evidence. *Id.* at 756.

[28] Whitt's argument fails on the second prong alone. Whitt asserts that Skyler's testimony is inherently contradictory because although he testified that Whitt deliberately shot Brennan, he also testified that he did not know that Brennan had been hit until he heard Brennan screaming. But this is not contradictory. As Skyler further explained, although he saw Whitt aim the gun at Brennan, he

did not know if Brennan moved out of the way in time or if Whitt simply missed. Tr. Vol. IV p. 137. As for the differences that Whitt points out between the testimony of Skyler and other witnesses to the shooting, it is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve. *Moore*, 27 N.E.3d at 758. The fact that Skyler's testimony did not match up exactly with the testimony of other witnesses does not render his testimony "incredibly dubious."

[29] Alternatively, Whitt argues that even if the killing was knowing or intentional, it was done in sudden heat and therefore he should have been convicted of only voluntary manslaughter. A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Level 2 felony. Ind. Code § 35-42-1-3. The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. *Id.* "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v. State,* 829 N.E.2d 21, 24 (Ind. 2005). It involves an "impetus to kill" that arises "suddenly." *Suprenant v. State*, 925 N.E.2d 1280, 1283 (Ind. Ct. App. 2010), *trans. denied*. Once a defendant presents evidence of sudden heat, the State bears the burden of disproving its existence beyond a reasonable doubt. *Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002), *reh'g denied*; *Jackson v. State*, 709 N.E.2d 326, 328 (Ind.

1999).  The existence of sudden heat is a classic question of fact to be determined by the jury.  *Jackson*, 709 N.E.2d at 329.

[30] Here, the trial court instructed the jury on voluntary manslaughter, including the requirement for sudden heat.  The fact that the jury convicted Whitt of murder was a rejection of his sudden-heat contention, and there is ample evidence in the record to support the jury's verdict.  The evidence shows that the thirty-two-year-old Whitt was in control of the situation from the very beginning and was not afraid to use the gun.  Instead of taking the gun from the much-younger Bradey and storing it at his house for safekeeping, Whitt brought the gun to a fight between teenagers, waved it around, and threatened to use it if the teenagers did not follow his rules about how the fight should proceed.  And when the Milton fight ended and everyone was leaving, Whitt threatened to beat up one of the Madison teenagers.

[31] About thirty minutes later, Whitt became angry when he saw a video of the Milton fight and wanted to go to Indiana to have the video deleted and to "whoop some a\*\*."  Instead of staying home, Whitt made the decision to go to Indiana.  Whitt said that if someone tried to hurt them, "he wouldn't think twice, that he'[d] kill them."  This foreshadowed what happened about an hour later and is evidence that Whitt reflected on his conduct, which is the opposite of sudden heat.

[32] When Whitt arrived at Crystal Beach, he was already enraged.  In other words, he was not suddenly provoked when he shot Brennan.  As described by several

witnesses, Whitt was "really angry," "furious," "aggravated," and "aggressive" upon his arrival. Whitt walked around and pointed the gun in several of the Madison teenagers' faces, asked them who wanted to die first, and threatened to put them in "boxes." This was not the conduct of someone who was suddenly provoked but rather the conduct of someone who was ready to kill when given the opportunity.

[33] This opportunity presented itself moments later when Brandon and Bradey began fighting. After Brandon punched Bradey and knocked him to the ground, Whitt went to the Santa Fe (where Bradey had stored the gun after taking it from Whitt), retrieved the gun, returned to the scene of the fight, and hit Brandon on the head with it.[8] *See* Ex. 33. This prompted several of the Madison teenagers to come to Brandon's aid. As Brennan started punching the back of Whitt's head, Whitt "turned," "pointed" the gun at Brennan, and "deliberately shot" him. Whitt then waved the gun around and pointed it at some of the other teenagers before running to the Santa Fe. As Bradey, Whitt, and Lucian sped off to Kentucky, Whitt told Bradey and Lucian that he would kill them and their families if they snitched and encouraged Bradey to keep driving away from the police. Whitt then lied to the police when asked where

---

[8] Whitt claims that there is insufficient evidence to show that he went to the Santa Fe to get the gun. To the contrary, Whitt told police during his April 19, 2015 interview that he got the gun from the Santa Fe after Brandon punched Bradey. *See* Ex. 129, pp. 20-21 (transcript of interview). The interview was admitted into evidence at trial as Exhibit 125. *See* Tr. Vol. VI p. 165. At trial, Whitt acknowledged that he told police during his interview that he got the gun from the Santa Fe. *Id.* at 231. However, he claimed that "[e]verything happened so fast" and that he no longer remembered where he got the gun. *Id.* The jury was free to discredit Whitt's trial testimony that he no longer remembered where he got the gun.

they were coming from.  Whitt did not have an "impetus to kill" that arose "suddenly"; rather, Whitt had a "impetus to kill" from the get-go, when he decided to bring the gun to the Milton fight and took deliberate actions up to the moment of the shooting and even after.  The State met its burden of disproving the existence of sudden heat.  We therefore affirm Whitt's conviction for murder.

[34]   Affirmed.


Mathias, J., and Crone, J., concur.