## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 19 2019, 6:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Caleb Kirk Singer,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | November 19, 2019<br><br>Court of Appeals Case No.<br>19A-CR-788<br><br>Appeal from the<br>Vanderburgh Circuit Court<br><br>The Honorable<br>David D. Kiely, Judge<br><br>Trial Court Cause No.<br>82C01-1803-MR-1704 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Caleb Kirk Singer appeals his conviction for murder, arguing that the evidence is insufficient to support it. He also appeals his fifty-five-year sentence, asserting that the trial court relied on improper aggravators and that his sentence is inappropriate in light of the nature of the offense and his character. We affirm.

# Facts and Procedural History

[2] In 2015, Singer met Summer Smith when they worked together at Wendy's, after graduating from high school in Evansville. A few months later, they started dating, and Singer moved in with Summer and her parents. In January 2017, Summer became pregnant with Singer's child. Around July 2017, Singer moved into his own apartment, which was paid for by the Department of Family Services. He was not allowed to have anyone else live in the apartment with him, so although Summer technically lived at her sister's apartment she often stayed at Singer's apartment with their son.

[3] In February 2018, Summer ended her relationship with Singer and began living fulltime at her sister's apartment with their four-month-old son. Although Singer and Summer had broken up before, this time was different as Summer had told Singer that "[she] was done," they were "never getting back together," and she would not let Singer see their son. Tr. Vol. III pp. 137, 187. About a week after the break up, Singer sent Summer several text messages, saying

"who are you with"; "who are you at Walmart with"; and "hello." *Id.* at 196-97. At first Summer did not respond, but after Singer sent her more messages asking who she was with and where she was, she responded "leave me alone please." *Id.* at 197.

[4] The morning of March 6, Singer texted Summer that "if I find out you're talking to other people, I'm going to kill you and your whole family, and I'm destroying everything you have, so hope you're happy right now, ignoring me and treating me like shit." *Id.* at 195. Throughout the remainder of the day, Singer sent Summer numerous text messages asking her to come to his apartment and to stay the night with him. Summer told Singer that she was not feeling well but that "he could come get his son if he wanted to spend time with him." *Id.* at 139. Singer continued asking Summer to stay the night with him. She eventually responded "we'll see" and told him that she would let him know her decision around 10:00 p.m. *Id.* At 8:00 p.m., Singer got off work. He called and texted Summer, but she did not respond. He then went to Summer's apartment and texted her sister to see if he could come inside to see his son. Summer's sister did not respond.

[5] While Singer was waiting outside Summer's apartment, he had a phone conversation with his best friend, Uriel Williams. During their conversation, Singer was agitated and angry and told Uriel that he believed Summer was cheating on him. After the call, Uriel met Singer at the apartment, and Singer borrowed his phone and used it to try to contact Summer. Once again, she did not respond. Singer and Uriel then drove a few blocks away, and Singer tried

to find Summer's location on his phone—they had previously shared their phone's locations with each other. Singer became increasingly frustrated and angry and told Uriel, "[I]f [Summer's] with another guy I [am] going to kill him." *Id.* at 160. After about ten minutes of searching, Singer saw that Summer was at her apartment, so he drove to her apartment to find her.

[6] Meanwhile, that same evening, Summer's friend, Nicholas Belcher, picked her up from her apartment, and they spent time together driving around town. Summer and Nicholas were friends in high school but had lost touch after graduation. Recently, they rekindled their friendship when Summer's son started going to Nicholas's mother's in-home daycare. Around 10:00 p.m., Nicholas drove Summer back to her apartment. When they got close to the apartment, Summer saw Singer's car in the driveway, so she told Nicholas to drive around the block. After about ten minutes, they drove back to the apartment, and Summer saw that Singer's car was gone. Nicholas parked his car in the apartment's driveway, walked Summer to the door, gave her a hug, and said goodbye. Summer walked inside the building and upstairs into her apartment.

[7] Nicholas went back to his car and started to back out of the driveway when Singer arrived and used his car to block Nicholas's car from getting out of the driveway. Singer was driving, and Uriel was in the passenger seat. Singer grabbed his handgun, got out of his car, and walked to the driver's side window of Nicholas's car. Uriel saw Singer use his gun to motion for Nicholas to roll down his window. When Nicholas rolled the window down about six inches,

Singer asked, "[W]ho are you, are you Nathan or Nick, what's your name?" *Id.* at 121. Nicholas said his name was Jim. Singer also asked if he had just dropped off Summer, and Nicholas said, "No." Then, Singer reached inside the car window and shot Nicholas in the face, killing him. Uriel saw Singer walk toward Summer's apartment before he returned to the car. Uriel asked, "[I]s he dead?," and Singer responded, "Yeah." *Id.* at 164. Singer also said that "[h]e was going to kill Summer too, but he didn't know which apartment she was in." *Id.*

[8] Singer drove a few blocks away, and Uriel got out of the car. Once Singer left, Uriel called the police. When officers arrived at the scene, they found Nicholas slumped over, dead in his car. Later that night, Singer called Summer and told her that he loved her and their son and that he was sorry, but he had to leave. At that point, Summer did not know that Singer had shot Nicholas. Singer then left town and threw his gun off a bridge into the Ohio River. The next morning, Singer was apprehended in Kentucky. During his interview with police, Singer admitted that he shot Nicholas. Singer was then charged with murder.

[9] In February 2019, a two-day jury trial was held. The jury was instructed on murder and voluntary manslaughter, including the requirement for sudden heat. Ultimately, the jury found Singer guilty of murder. At the time of the sentencing hearing in March 2019, Singer was twenty years old and had no prior criminal history. Singer's aunt testified that he had a difficult childhood and that when he was nine, he found his mother dead from an overdose. *See*

Tr. Vol. II p. 38. Singer's aunt said that after Singer's mother died, he was placed with his father, who also struggled with addiction, and eventually, he ended up in foster care. *See id.* After Singer's aunt testified, the trial court noted that it had received about twenty letters from Nicholas's family and friends describing their loss. The trial court also heard testimony from Nicholas's mother, father, cousin, fifteen-year-old brother, and others. During some witnesses' testimony, Singer smirked. Nicholas's father pointed this out, telling Singer that after the jury's verdict:

> [Y]ou sat there and smirked in front of my entire family with a smile on your face. I've watched other testimonies up here already today, and people when they mention you should get the max sentence, what's your reaction, you smile, just like you're doing now. . . .

*Id.* at 48. The trial court then identified mitigating and aggravating circumstances. As for mitigators, the court found that Singer was twenty years old, had no prior criminal history, and experienced childhood trauma. The court then noted that "[Singer] had an opportunity to apologize to the family, and [he] elected not to do that." *Id.* at 53. The court found that Singer's lack of remorse and the nature of the offense were aggravating circumstances. The trial court sentenced Singer to fifty-five years in the Department of Correction, the advisory sentence. *See* Ind. Code § 35-50-2-3(a).

[10] Singer now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

Singer contends that the evidence is insufficient to convict him of murder. Specifically, he argues that he acted under sudden heat and therefore he should have been found guilty of voluntary manslaughter instead.

When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* (quotation omitted). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

To determine whether the evidence is sufficient, we must consider the elements of murder and voluntary manslaughter. A person commits murder when they knowingly or intentionally kill another human being. Ind. Code § 35-42-1-1. A person commits voluntary manslaughter when they knowingly or intentionally kill another human being while acting under sudden heat. Ind. Code § 35-42-1-3(a). The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. *Id.* at (b). "Sudden heat exists when a defendant is 'provoked by anger, rage, resentment, or terror,

to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Brantley v. State*, 91 N.E.3d 566, 572 (Ind. 2018) (quoting *Isom v. State*, 31 N.E.3d 469, 486 (Ind. 2015)). It involves an "impetus to kill" that arises "suddenly." *Suprenant v. State*, 925 N.E.2d 1280, 1283 (Ind. Ct. App. 2010), *trans. denied*. Words alone, however, are not sufficient provocation to reduce murder to manslaughter. *Id.* Once a defendant presents evidence of sudden heat, the State bears the burden of disproving its existence beyond a reasonable doubt. *Whitt v. State*, 91 N.E.3d 1082, 1093 (Ind. Ct. App. 2018), *trans. denied*. The existence of sudden heat is a classic question of fact to be determined by the jury. *Id.*

[14] Singer's sudden-heat theory is based on the premise that "he blacked out and could not control his actions" after Nicholas "lied" to him because he thought that Nicholas "was the reason he would no longer be able to see his son." Appellant's Br. pp. 15-16. Here, the trial court instructed the jury on voluntary manslaughter, including the requirement for sudden heat. The fact that the jury convicted Singer of murder was a rejection of his sudden-heat contention, and there is ample evidence to support the jury's verdict. First, Summer told Singer that she was done and that he would no longer be able to see their son. *See Massey v. State*, 955 N.E.2d 247, 257 (Ind. Ct. App. 2011) (an expression of one's desire to end a relationship cannot, as a matter of law, constitute sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection). Then, Singer sent Summer text messages

threatening to kill her and her whole family. When Summer did not respond to Singer's text messages, he told Uriel that if he found out that Summer was with another man, he would kill them. And when Singer saw Nicholas in Summer's driveway, he approached Nicholas's car and asked him two questions, and when Nicholas answered with lies, Singer shot him. Again, words alone, even if they are lies, are not enough to provoke sudden heat. This evidence was sufficient for the jury to conclude that there was a lack of sudden heat beyond a reasonable doubt. Accordingly, we affirm Singer's murder conviction.

# II. Sentencing

## a. Aggravators

[15] Singer next contends that the trial court considered improper aggravating factors when sentencing him. Sentencing decisions rest within the sound discretion of the trial court and are reviewed only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

[16] First, Singer asserts that there is no evidence to support the trial court's finding that he showed a lack of remorse. A trial court may consider a defendant's lack of remorse as an aggravator. *Sloan v. State*, 16 N.E.3d 1018, 1027 (Ind. Ct. App. 2014). A lack of remorse is displayed when a defendant shows disdain or recalcitrance, the equivalent of "I don't care." *Id.* Singer claims that he did not "show recalcitrance or disdain" but instead was "maintain[ing] his innocence." Appellant's Br. p. 19. However, the evidence shows that during the sentencing

hearing, Singer was smiling and smirking as the victim's family and friends testified. Nicholas's father pointed this out, saying, "I've watched other testimonies up here already today, and people when they mention you should get the max sentence, what's your reaction, you smile, just like you're doing now." Tr. Vol. II p. 48. As such, the trial court did not abuse its discretion in finding Singer's lack of remorse to be an aggravating factor.

[17] Next, Singer argues that the trial court erred by identifying the nature of the offense as an aggravator. Singer alleges that he "did not commit the offense with any brutality than is [sic] already inherent in any murder offense." Appellant's Br. p. 19. Singer's interpretation of the nature of his offense is inaccurate. That is, the evidence shows that Singer shot Nicholas, whom he did not even know, in the face at point-blank range. Killing someone execution style is a brutal way of committing the offense of murder. *See McCallister v. State*, 91 N.E.3d 554, 566 (Ind. 2018) (condemning execution-style murder); *see also Krempetz v. State*, 872 N.E.2d 605, 616 (Ind. 2007) (expressing outrage over execution-style killing committed against a defenseless victim). As such, we find that the trial court did not abuse its discretion.

## b. Inappropriateness

[18] Singer also argues that his sentence is inappropriate and asks us to revise it to the minimum of forty-five years pursuant to Indiana Appellate Rule 7(B), which provides that an appellate court "may revise a sentence authorized by statute, if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the

character of the offender." "Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). Because we generally defer to the judgment of trial courts in sentencing matters, defendants have the burden of persuading us that their sentences are inappropriate. *Schaaf v. State*, 54 N.E.3d 1041, 1044-45 (Ind. Ct. App. 2016).

[19] The sentencing range for the crime of murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Singer received the advisory sentence.

[20] With regard to the nature of the offense, as discussed above, Singer shot Nicholas, a man he did not know, at point-blank range because he suspected his ex-girlfriend was cheating on him. Furthermore, after he shot Nicholas, Singer told Uriel that he was going to kill Summer too, but he didn't know which apartment was hers. Finally, Singer shot Nicholas after spending two days texting and threatening Summer because she decided to end their relationship.

[21] As for Singer's character, it is true that he had no criminal history and a difficult childhood. However, at the sentencing hearing, he did not present any evidence of his "virtuous traits" or provide any "examples of good character." *See Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Furthermore, when

given the opportunity to express remorse for what happened, he chose to smile and smirk as Nicholas's family and friends testified about their loss.

[22] Singer has not convinced us that his sentence is inappropriate.

[23] Affirmed.

Riley, J., and Bradford, J., concur.